**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AVM TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-33-RGA-MPT |
| | ) | |
| INTEL CORPORATION, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>JOINT [PROPOSED] FINAL JURY INSTRUCTIONS</u>**

## 1. GENERAL INSTRUCTIONS

### 1.1.    INTRODUCTION[1]

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

Each of you has been provided a copy of these instructions.  If you prefer, you may read along as I deliver them; however, I would encourage you to focus your attention on me while the instructions are being read.  You will be able to take your copies with you into your deliberations and refer to them at any time, if necessary.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. I will then explain the positions of the parties and the law you will apply in this case. Last, I will explain the rules that you must follow during your deliberations in the jury room.

Please listen very carefully to everything I say.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.[2]

---

[1]     *AVM1* Joint Final Jury Instructions, Dkt. 246; *Innovative Display Technologies LLC v. LG*, No. 13-cv-2109-RGA, D.I. 498 (joint proposed preliminary jury instructions) ("IDT").

[2]     IDT.

## 1.2.    JURORS' DUTIES[3]

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide which party should prevail on the issues presented.  I will instruct you about the burden of proof shortly.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

---

[3]     *AVM1*; IDT; 1993 Delaware Model Patent Jury Instructions ("1993 Model Instructions").

### 1.3.    BURDENS OF PROOF[4]

This is a civil case in which AVM is alleging patent infringement by Intel. Those of you who are familiar with criminal cases will have heard the term "proof beyond a reasonable doubt." That burden does not apply in a civil case and you should, therefore, put it out of your mind in considering whether or not AVM or Intel has met its burden of proof.

AVM has the burden of proving patent infringement by what is called a preponderance of the evidence. That means AVM has to produce evidence which, when considered in light of all of the facts, leads you to believe that what AVM claims is more likely true than not.  To put it differently, if you were to put the plaintiff's and the defendant's evidence on the opposite sides of a scale, the evidence supporting the plaintiff's claims would have to make the scales tip somewhat on his side.[5]

[**AVM's Proposal:**

In this case, Intel contends that U.S. Patent No. 5,859,547 patent, which I will also refer to as the '547 patent, is invalid.  A patent, however, is presumed to be valid.  This means Intel has the burden of proving invalidity by clear and convincing evidence.  Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.[67]]

---

[4]      *AVM1*

[5]      *AVM1*; 1993 Model Instructions.

[6]      **AVM**: *AVM1*; 1993 Model Instructions.

[7]      **AVM**:  The statement that a patent is presumed valid is the law, and it is an important instruction because AVM will not be presenting its validity evidence in its case in chief; this instruction explains why.

**[Intel's Proposal**

In this case, Intel contends that U.S. Patent No. 5,859,547 patent, which I will also refer to as the '547 patent, is invalid.  Intel has the burden of proving invalidity by clear and convincing evidence.  Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.[8]]

---

[8]    **Intel**: Intel's proposed paragraph derives from language the parties jointly proposed and agreed to for the final jury instructions in *AVM1*, D.I. 246 at 4.  It is an accurate statement of the law, and it does not contain any extraneous or potentially prejudicial language.

AVM's proposal, which would instruct the jury that a "patent, however, is presumed to be valid," is cumulative, unnecessary, and prejudicial.  The instruction already recites the "clear and convincing evidence" standard.  It would be duplicative to add the "presumed to be valid" language because the presumption of validity is simply the policy reason behind the "clear and convincing evidence standard."   Such cumulative language would be prejudicial to Intel by suggesting to the jury that Intel has a burden of proof beyond the "clear and convincing evidence" standard.

### 1.4.    EVIDENCE DEFINED[9]

You must make your decision based only on the evidence that you saw and heard here in the courtroom. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath (including deposition testimony that has been played or read to you), the exhibits that I allowed into evidence, and any facts that the parties agreed to by stipulation.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. None of my comments or questions are evidence.

During the trial I may not have let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I may have ordered you to disregard things that you saw or heard. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

---

[9]    *AVM1*; IDT; 1993 Model Instructions (minor changes to include statements about deposition designations).

**1.5. USE OF NOTES[10]**

You may use notes taken during the trial to assist your memory. Remember that your notes are for your personal use. They may not be given or read to anyone else. Do not use your notes, or any other juror's notes, as authority to persuade fellow jurors. Your notes are not evidence, and they are by no means a complete outline of the proceedings or a list of the highlights of the trial. Your notes are valuable only as a way to refresh your memory. Your memory is what you should be relying on when it comes time to deliberate and render your verdict in this case.

---

[10] *AVM1.*

### 1.6. STATEMENTS OF COUNSEL[11]

A further word about statements and arguments of counsel. The attorney's statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented. If you remember the evidence differently from the attorneys, you should rely on your own recollection.

The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law. An attorney may argue all reasonable conclusions from evidence in the record. It is not proper, however, for an attorney to state an opinion as to the truth or falsity of any testimony or evidence. What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence that an attorney has offered during opening or closing statements, or at any other time during the course of the trial.

---

[11]     *AVM1.*

### 1.7.    CONSIDERATION OF EVIDENCE[12]

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

---

[12]    *AVM1*; 1993 Model Instructions.

## 1.8.    DIRECT AND CIRCUMSTANTIAL EVIDENCE[13]

There are two kinds of evidence:  direct and circumstantial.  Direct evidence is direct proof of a fact, such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  As a general rule, the law makes no distinction between these two types of evidence, but simply requires that you find facts from all the evidence in the case, whether direct or circumstantial or a combination of the two.

---

[13]    *AVM1*

## 1.9.    CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility.  You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.[14]

**[AVM's Proposal:**[15]

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said (or did) something, (or failed to say or do something) that was different from the testimony he gave at the trial.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.]

**[Intel's Proposal**[16]

---

[14]    *AVM1*

[15]    **AVM**: 1993 Model Instructions

[16]    **Intel**: Intel's proposal is the verbatim language that the parties jointly proposed in *AVM1*, D.I. 246 at 7.  This language is more concise than the language proposed by AVM, and it is therefore less likely to lead to juror confusion.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all.  But if you can't do this, then it is your duty and privilege to believe the testimony that, in your judgment, is most believable and disregard any testimony that, in your judgment, is not believable.  This instruction applies to the testimony of all witnesses, including expert witnesses.]

## 1.10.   EXPERT WITNESSES

When knowledge of technical subject matter might be helpful to the jury, a person who has special training or experience in that technical field – he or she is called an expert witness – is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to judge the credibility of the expert witness and decide whether to rely upon his or her testimony.[17]

**[AVM's Proposal:**

### 1.10.1. CREDIBILITY OF DR. SUBRAMANIAN[18]

I instruct you that in considering the credibility of Intel's witnesses, you are entitled to consider the fact that one of Intel's expert witnesses, Dr. Subramanian, has provided inaccurate

---

[17]     *AVM1*; IDT; 1993 Model Instructions.

[18]     **AVM**: *See* D.I. 604 at 5-8 for AVM's basis for requesting this instruction.  Dr. Subramanian clearly and unequivocally took the position that (1) none of Intel's register files in AVM1 had simultaneous activation, and (2) that even if they had some "overlap," it did not amount to simultaneous activation.  (*Id.* (citing D.I. 445, JA48 at ¶¶248, 250-52).)  He now represents that the opposite is true.  (D.I. 443, JA35 ¶¶218-221, 252.)  Contrary to *AVM1*, he now states that there is no minimum amount of overlap and that any overlap amounts to simultaneous activation (as opposed to *AVM1* where he unequivocally stated that overlap during switching transitions did not amount to simultaneous activation).  (D.I. 443, JA35 ¶¶333, 342; D.I. 444, JA38 ¶¶19, 22.)  As explained in AVM's surreply brief regarding Kessler (D.I. 604 at 5-8), AVM recognizes that litigations are complex, and there are many instances in which positions can properly change. AVM also recognizes that there can be principled disputes about the nature of positions that were taken in a litigation that occurred so many years ago. At the same time, AVM believes that the conduct of Dr. Subramanian goes well beyond a simple difference of opinion. Intel knows exactly how its products operate—and it presumably provided its expert with the relevant data. Whether the *AVM1* products did or did not have simultaneous activation is unimportant for the jury.  And AVM would be prejudiced if it had to cross-examine Dr. Subramanian in front of the jury with his contradictory positions, because it would invite the jury to speculate about the *AVM1* products and case.  This instruction is necessary.

reports in the past on the operation of Intel circuits in its register files.  You may give this whatever weight you consider appropriate when assessing his credibility as a witness.][19]

[**AVM's Proposal:**

## 1.11.   NUMBER OF WITNESSES[20]

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference. Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.] [21]

------

[19]    **Intel**: Intel objects to the inclusion of any instruction regarding Dr. Subramanian's credibility.  AVM's proposed instruction is baseless, inappropriate, and prejudicial to Intel. Proposed Final Instruction 1.9 already instructs the jury how to assess the credibility of all witnesses.  To the extent that AVM alleges that there is any inconsistency or inaccuracy in Dr. Subramanian's report (and the Court deems it relevant to Dr. Subramanian's trial testimony), AVM can attempt to explore those issues on cross-examination.  Moreover, as explained in Intel's reply brief in support of its motion for summary judgment that AVM's infringement claims are barred by the Kessler doctrine and claim preclusion, Dr. Subramanian's opinions in *AVM1* and *AVM2* are consistent.  D.I. 532 at 4-5.  At no time has Dr. Subramanian provided inaccurate reports as to the operation of Intel's circuits in its register files.  *Id.* AVM omits portions of Dr. Subramanian's *AVM1* report where he acknowledged that Intel did allow some contention in its *AVM1* products through "waivers" of its design rules.  *Id.*  In other statements excerpted by AVM, Dr. Subramanian addressed the particular circuits that AVM had accused of infringement in *AVM1* and opined, based on his review of Intel's PV data and other evidence specific to those individual circuits, that there was no (end-of-precharge) contention or overlap. *Id.*  Dr. Subramanian had no reason to, and did not, address whether there was contention or overlap in other individual circuits that AVM had not accused of infringement in *AVM1*.  *Id.*

[20]    **AVM**: IDT; 1993 Model Instructions.

[21]    **Intel**: This instruction was not included in the *AVM1* joint proposal, and there is no reason to include it in this case. The proposed instructions already inform the jury as to the relevant burdens and types of evidence.  An instruction regarding the number of witnesses is therefore unnecessary, and has the potential to confuse the jury.  AVM's proposed instruction may also be prejudicial to Intel to the extent it emphasizes to the jury that AVM is a small company and Intel is a large company.

### 1.12.   DEPOSITION TESTIMONY[22]

During the trial, certain testimony was presented to you through depositions that were read into evidence or electronically played. This testimony must be given the same consideration you would give it had the witness personally appeared in court. Like the testimony of a live witness, the statements made in a deposition are made under oath and are considered evidence that may be used to prove particular facts.

---

[22]     *AVM1.*

## 2.    THE PARTIES AND THEIR CONTENTIONS[23]

As I did at the start of the case, I will give you a summary of each side's contentions in this case.  I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

As I previously told you, AVM alleges that certain Intel microprocessors from the Sandy Bridge, Ivy Bridge, Haswell, and Broadwell microprocessor families infringe claims 1-7, 9, 12-14, 16, and 18-21 of the '547 Patent.  These are what we will refer to as the "the asserted claims" of the patent.  The patent is in the packet I have provided for you, and a chart with the asserted claims is attached. AVM also alleges that Intel's infringement was willful.[24][25]

Intel denies that it has infringed the asserted claims of the '547 patent and also argues that the Asserted Claims are invalid.

In this case, you must decide the issues according to the instructions I give you.  In general these issues are:

1.    Whether AVM has proven by a preponderance of the evidence that Intel has infringed any of the asserted claims of the '547 patent.
2.    Whether Intel has proven by clear and convincing evidence that any of the asserted claims of the '547 patent are invalid.
3.    If any patent claims are infringed and not invalid, what amount of damages AVM has proven by a preponderance of the evidence.

---

[23]    *AVM1*, Dkt. 246 at 8.

[24]    **Intel**: Intel agrees to this sentence regarding willfulness only if the Court denies Intel's motion for summary judgment of no willful infringement and no enhanced damages (D.I. 421), and also decides that the issue of willfulness should go to the jury.  Intel's position is that the question of willfulness should not go to the jury because evidence of Intel's allegedly "willful" conduct is not relevant to any issue that the jury must decide (JPTS, Ex. 5, Intel's Statement of Law To Be Litigated).

[25]    **AVM:** AVM's position is that the Federal Circuit has held that willfulness is a jury issue. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 & n.13 (Fed. Cir. 2016).

4.      If any patent claims are infringed and not invalid, whether Intel willfully infringed the '547 patent.[26]

---

[26]     **Intel**: Intel agrees to this sentence regarding willfulness only if the Court denies Intel's motion for summary judgment of no willful infringement and no enhanced damages (D.I. 421), and also decides that the issue of willfulness should go to the jury.  Intel's position is that the question of willfulness should not go to the jury because evidence of Intel's allegedly "willful" conduct is not relevant to any issue that the jury must decide (JPTS, Ex. 5, Intel's Statement of Law To Be Litigated).

### 3.      THE PATENT CLAIMS

### 3.1.      THE ROLE OF CLAIMS IN THE PATENT[27]

Before you can decide many of the issues in this case, you will need to understand the

role of patent "claims."  The patent claims are the numbered sentences at the end of each patent.

[**AVM's Proposal:**  The claims are important because it is the words of the claims—not the

specification, the embodiments or examples, experiments performed by the inventor, belief of

the inventor, or the contents of other patent applications from the inventor—that define what a

patent covers and whether there is infringement.][28]

[**Intel's Proposal:**  The claims are important because it is the words of the claims that

define what a patent covers.[29]]

The figures and text in the rest of the patent provide a description and/or examples of the

invention and provide a context for the claims, but it is the claims that define the breadth of the

patent's coverage.  Each claim is effectively treated as if it were a separate patent, and each

---

[27]      FCBA Model Instruction B.2.1

[28]      **AVM:** This instruction is necessary because Intel's defenses point to features or potential uses in the specification that are not included in the claims.  Specifically instructing the jury that it is the claims and not the specification or embodiments that define the invention will thus help prevent jury confusion.

[29]      **Intel**: Intel's proposed sentence is taken verbatim from FCBA Model Instruction B.2.1 and would correctly instruct the jury that the words of the claim define what a patent covers. AVM's proposed instruction, by contrast, seeks to add novel and unnecessary language to the FCBA Model Instruction B.2.1.  The next sentence in the FCBA instruction to which both parties agree already informs the jury that the "figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage."  AVM's proposed sentence is therefore repetitive, unnecessary, and potentially confusing.

claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid. The law says that it is my role to define the terms of the claims and it is your role to apply my definitions to the issues that you are asked to decide in this case. Therefore, as I explained to you at the start of the case, I have determined the meaning of the claims and I will provide to you my definitions of certain claim terms. You must accept my definitions of these words in the claims as being correct. It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and validity.

## 3.2.    HOW A CLAIM DEFINES WHAT IT COVERS[30]

I will now explain how a claim defines what it covers. A claim sets forth, in words, a set of requirements. Each claim sets forth its requirements in a single sentence. If a device or a method satisfies each of these requirements, then it is covered by the claim.

There can be several claims in a patent. Each claim may be narrower or broader than another claim by setting forth more or fewer requirements. The coverage of a patent is assessed claim-by-claim. In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." When a thing (such as a product or a process) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim. In other words, a claim covers a product or process where each of the claim elements or limitations is present in that product or process.

Sometimes the words in a patent claim are difficult to understand, and therefore it is difficult to understand what requirements these words impose. It is my job to explain to you the meaning of the words in the claims and the requirements these words impose.  As I just instructed you, there are certain specific terms that I have defined and you are to apply the definitions that I provide to you.

By understanding the meaning of the words in a claim and by understanding that the words in a claim set forth the requirements that a product or process must meet in order to be covered by that claim, you will be able to understand the scope of coverage for each claim. Once you understand what each claim covers, then you are prepared to decide the issues that you will be asked to decide, such as infringement and invalidity.

---

[30]     FCBA Model Instruction B.2.2

### 3.3. CLAIM CONSTRUCTION[31]

I have already defined the meaning of some of the words of the patent claims in this case. I will read these definitions to you now, and these definitions have been provided to you on a chart placed in the front of your patent books. You must accept my definition of these words in the claims as correct. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity. These issues are yours to decide.

These are the terms and definitions:

- "anti-float circuit" is defined as "a circuit used to prevent the precharge node from floating or otherwise losing the current state of the circuit"

- "between the dynamic logic block and the precharge transistor" is defined as "positioned such that the only way charge can flow from the precharge transistor to the logic block is by passing through the evaluation transistor"

- "clock signal" is defined as "a signal occurring or recurring at a constant rate, used for synchronization"

- "clock signal node" is defined as "a point on a circuit that a clock signal passes through on its way to both the precharge transistor and the evaluation transistor"

- "coupled to" is defined as "connected to, directly or through intervening elements"

- "coupled between" is defined as "connected between, directly or through intervening elements"

---

[31]     *AVM1* and the Claim Construction Order in this case (D.I. 344).  Both parties maintain their positions on any adverse claim-construction rulings, and reserve their rights to appeal any such rulings.

- "couplable to" is defined as "capable of being connected"

- "coupling" is defined as "connected, either directly or through intervening elements"

- "a delay" is defined as "a circuit element that delays the clock signal to the precharge transistor"

- "during a major portion of the evaluation phase" is defined as "a period greater than 50% of the evaluation phase"

- "during a major portion of an evaluation clock phase" is defined as "a period greater than 50% of an evaluation clock phase"

- "during a minor portion of the evaluation clock phase" is defined as "a period less than 50% of the evaluation clock phase"

- "dynamic logic circuit" is defined as "a dynamic circuit that implements a logic function"

- "dynamic logic block" or "logic block" is defined as "a circuit block that implements the logic function of the dynamic logic circuit"

- "evaluation transistor" is defined as "a transistor that is connected to a clock signal and is used to control when the precharge node may discharge"

- "for simultaneously activating" is defined as "for causing to be on at the same time"

- "precharge transistor" is defined as "a transistor that is connected to a clock signal and charges the precharge node"

- "precharge node" is defined as "the output node of the dynamic logic circuit"[32]

---

[32]   **AVM's Proposal:**  This section of the jury instructions will be supplemented with the outcome of the parties' claim construction dispute regarding the term "coupled between the logic-block output node and the precharge node"

- **[Intel's Proposal:** "coupled between the logic-block output node and the precharge node" is defined as "positioned such that the only way charge can flow from the precharge transistor to the logic block is by passing through the evaluation transistor"[33]]

### 3.4. INDEPENDENT AND DEPENDENT CLAIMS[34]

This case involves two types of patent claims: independent claims and dependent claims. An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim.  Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, asserted claims 1, 12, 19, and 21 of the '547 patent are each independent claims.

The remainder of the asserted claims in the '547 patent are "dependent claims." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements.  In this way, the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claim(s) to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim(s) to which it refers. A product that meets all of the requirements of both the dependent claim and the claim(s) to which it refers is covered by that dependent claim.

---

[33]    **Intel**: As explained in Intel's opening brief in support of its motion for partial summary judgment of non-infringement, Intel requests that the Court construe the "between" limitation in claim 12 at this time because it has become apparent that the parties have a fundamental dispute about this term's meaning.  D.I. 418 at 11.  Intel believes that the "between" limitation in claim 12 should have the same meaning as the "between" limitation in claims 1 and 19—i.e., it should require the evaluation transistor to be "positioned such that the only way charge can flow from the precharge transistor to the logic block is by passing through the evaluation transistor." *Id.*

[34]    Adapted from FCBA Model Instruction B.2.2a.

Because a dependent claim incorporates all of the features of the independent claim it refers to, if you find that an independent claim is not infringed, then the claims that depend on that independent claim cannot be infringed. Similarly, if you find that an independent claim is not anticipated or obvious, then the claims that depend on that independent claim are also not anticipated or obvious.[35]

---

[35]     *AVM1*, Dkt. 246 at 11.

**4.0.   INFRINGEMENT**

**4.1. INFRINGEMENT GENERALLY[36]**

I will now instruct you how to decide whether or not Intel has infringed the '547 Patent. Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another. In this case, there are three possible ways that a claim may be infringed. The three types of infringement are called: (1) direct infringement; (2) active inducement; and (3) contributory infringement. Active inducement and contributory infringement are referred to as indirect infringement. There cannot be indirect infringement without someone else engaging in direct infringement.  To prove indirect infringement, AVM must also prove that Intel's indirect infringement caused direct infringement.

In this case, AVM has alleged that Intel directly infringes the '547 patent.

In order to prove infringement, AVM must prove that the requirements for one or more of these types of infringement are met by a preponderance of the evidence, i.e., that it is more likely than not that all of the requirements of one or more of each of these types of infringement have been proved.

I will now explain each of these types of infringement in more detail.

---

[36]     FCBA Model Instruction B.3.1; *see also Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005) (infringement must be proven by a preponderance of the evidence); *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999) (a patentee must "prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim"); *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1468-69 (Fed. Cir. 1993) (upholding lower court's finding of noninfringement based on plaintiff's failure to prove that the accused product met all of the claimed requirements).

## 4.2.  DIRECT INFRINGEMENT BY LITERAL INFRINGEMENT[37]

There are two types of "direct infringement": (1) "literal infringement" and (2) "infringement under the doctrine of equivalents." In order to prove direct infringement by literal infringement, AVM must prove by a preponderance of the evidence, i.e., that it is more likely than not, that Intel made, used, sold, offered for sale within, or imported into the United States a product or process that meets all of the requirements of a claim and did so without the permission of AVM during the time the '547 patent was in force. You must compare the Accused Products with each and every one of the requirements of a claim [**AVM's Proposal:** — not the specification—][38][39] to determine whether all of the requirements of that claim are met.

[**AVM's Proposal:**  If they are met, there is literal infringement, regardless of whether the

---

[37]      Based on FCBA Model Instruction B.3.1a; *see also Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1316, n.1 (Fed. Cir. 2006) (dependent claims not infringed when independent claim not infringed); *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1352-53 (Fed. Cir. 2005) (no literal infringement where accused product did not contain every element of the claim); *Cross Med. Prods. v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1309-11 (Fed. Cir. 2005) (no direct infringement where accused product did not include each claim limitation); *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353-54 (Fed. Cir. 2001) (no literal infringement where all of the elements of the claim not present in the accused system); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986) (affirming finding of direct infringement based on circumstantial evidence).

[38]      **AVM:** This instruction is necessary because Intel's defense point to features or potential uses in the specification that are not included in the claims.  Instructing the jury that it is the claims and not the specification or embodiments that define the invention will thus help prevent jury confusion.

[39]      **Intel**: AVM seeks to modify the FCBA Model Instruction B.3.1a by adding language that is unnecessary and potentially confusing.  The FCBA Model Instruction correctly instructs the jury "to compare the [Accused Products] with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met."   No further language is necessary, and there is no reason to deviate from the model language.

Accused Product exhibits other characteristics or benefits stated in the specification.[40]  Direct

and literal infringement do not require proof that Intel intended to infringe.  Accidental

infringement is still infringement.[41]][42]

You must determine, separately for each asserted claim, whether or not there is

infringement.  There is one exception to this rule. If you find that a claim on which other claims

depend is not infringed, there cannot be infringement of any dependent claim that refers directly

or indirectly to that independent claim. On the other hand, if you find that an independent claim

has been infringed, you must still decide, separately, whether the Accused Products meet

additional requirements of any claims that depend from the independent claim, thus, whether

---

[40]    **AVM**: *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 988 (Fed. Cir. 2009)
("Even assuming, as Cordis argues, that the specification describes long-term non-
thrombogenicity as an important objective of the invention, it does not . . . require that those
specific words be used in the claim construction."); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355
F.3d 1327, 1331 (Fed. Cir. 2004) ("[P]atentees [are] not required to include within each of their
claims all of [the] advantages or features described as significant or important in the written
description.").

[41]    **AVM**: One of Intel's points of emphasis in its non-infringement case is that it does not
infringe because its designers did not intend any delay to cause contention and/or simultaneous
activation.  (*See e.g.*, D.I. 444, JA36 at ¶¶ 160, 161, 163, 490, 491, 627, 633, 634, 637).  Intent to
infringe is irrelevant: direct infringement, as well as infringement under the doctrine of
equivalents, is an objective inquiry.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754,
770 (2011); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 35-37 (1997); *Hilton
Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1519 & 1523 (Fed. Cir. 1995), *rev'd
on other grounds*, 520 U.S. 17 (1997)

[42]    **Intel**: Again, AVM seeks to add language to the FCBA Model Instruction B.3.1a that is
unnecessary, confusing, and potentially prejudicial to Intel.  To the extent the Court wants to
entertain any language regarding intent, which Intel submits that it should not, a more balanced
approach such as the following would be more appropriate:

Direct infringement generally does not require proof that Intel intended to infringe.
However, the function performed by components of the Accused Products may be
relevant to whether those components literally meet certain claim limitations, and
evidence of Intel's design purpose may be relevant to evaluating the function of those
components (e.g., whether an accused component is "for causing" a claimed function).

those claims have also been infringed.  A dependent claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

### 4.3.   DIRECT INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS.[43]

If a company makes, uses, sells, offers to sell within, or imports into the United States a product that does not meet all of the requirements of a claim and thus does not literally infringe that claim, there can still be direct infringement if that product satisfies that claim "under the doctrine of equivalents."

Under the doctrine of equivalents, a product infringes a claim if the accused product contains elements corresponding to each and every requirement of the claim that is equivalent to, even though not literally met by, the accused product. You may find that an element or step is equivalent to a requirement of a claim that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the structure: (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the requirement of the claim.

Known interchangeability at the time of infringement is another factor.  In order for the structure to be considered interchangeable, the structure must have been known at the time of the

---

[43]     FCBA Model Instruction 3.1c as updated for this case; *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950) (explaining what constitutes an "equivalent"); *Interactive Pictures Corp. v. Infinite Pictures Inc.*, 274 F.3d 1371, 1381-82 (Fed. Cir. 2001); *Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046 (Fed. Cir. 2002) (no infringement under the doctrine of equivalents); *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999) (distinguishing between the doctrine of equivalents and the statutory term "equivalents"); *Hughes Aircraft Co. v. United States*, 140 F.3d 1470, 1475 (Fed. Cir. 1998); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998); *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994).

alleged infringement to a person having ordinary skill in the field of technology of the patent.

Interchangeability at the present time is not sufficient.

In order to prove infringement by "equivalents," AVM must prove the equivalency of the structure to a claim element by a preponderance of the evidence.

**[AVM's Proposal:**

As with literal infringement, infringement under the doctrine of equivalents does not require proof that Intel intended to infringe.  Accidental infringement is still infringement.[44]][45]

---

[44]    **AVM**: One of Intel's points of emphasis in its non-infringement case is that it does not infringe because its designers did not intend any delay to cause contention and/or simultaneous activation.  (*See e.g.*, D.I. 444, JA36 at ¶¶ 160, 161, 163, 490, 491, 627, 633, 634, 637).  Intent to infringe is irrelevant: direct infringement, as well as infringement under the doctrine of equivalents, is an objective inquiry.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 770 (2011); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 35-37 (1997); *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1519 & 1523 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997)

[45]    **Intel:** Again, AVM seeks to add language into the FCBA Model Instruction B.3.1a that is unnecessary, confusing, and potentially prejudicial.  No additional language is necessary or appropriate in either this instruction or the previous section, but if the Court were to decide to include language regarding intent in the previous section, it certainly should not repeat that language here.  By doing so, the Court would be elevating the importance of this instruction, which would potentially prejudice Intel.  To the extent the Court wants to entertain any language regarding the intent, which Intel submits that it should not, a more balanced approach such as the following would be appropriate:

> Direct infringement generally does not require proof that Intel intended to infringe.  However, the function performed by components of the Accused Products may be relevant to whether those components meet certain claim limitations, and evidence of Intel's design purpose may be relevant to evaluating the function, way, and result of those components.

[**Intel's Proposal:**

The doctrine of equivalents may not be applied in a manner that reads a limitation out of the claim. The doctrine of equivalents may not expand the scope of a claim by eliminating claim limitations in their entirety.[46]][47]

---

[46]     **Intel**: Intel's proposed language is supported by the case law and the 2016 Federal Circuit Bar Association model jury instructions.  *See Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 n.8 (1997); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) (explaining that "all claim limitations are not entitled to an equal scope of equivalents [and] many limitations warrant little, if any, range of equivalents" and holding that allowing a "minority … to be equivalent to a majority would vitiate the ['majority'] requirement"); *Impulse Tech. Ltd v. Microsoft Corp.*, No. 11-586-RGA, 2015 WL 5568616, at *3 (D. Del. Sept. 22, 2015) (applying claim vitiation where "[t]he accused product operates in essentially the opposite fashion of that described in the claims"); FCBA 3.1d ("You may not determine that an alternative aspect of a product is equivalent to an unmet requirement of a claim if a finding of infringement under the doctrine of equivalents would effectively eliminate that requirement. Specifically, the alleged equivalent cannot eliminate or ignore an element or requirement of the claim.").

[47]     **AVM**: AVM objects to this language as vitiation is an issue of law to be addressed by the Court.

[**Intel's Proposal**

## 4.4  LIMITATIONS ON INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS[4849]

The prior art may preclude a finding of infringement under the doctrine of equivalents.  I will explain what "prior art" is, but generally speaking, "prior art" is things that were already known or done before the invention.  In reaching your decisions in this case, you must use the definition of "prior art" that I provide to you.

To determine whether the prior art precludes a finding of infringement under the doctrine of equivalents, you must first have in mind a "hypothetical claim" that would cover the Accused Products literally.  The hypothetical claim is exactly the same as the claim at issue, except that the unmet claim requirements are broadened so that they would be met by the allegedly "equivalent" hypothetical claim.

Once you have this equivalent "hypothetical claim" in mind, you must decide whether this hypothetical claim would have been invalid for either anticipation or obviousness.  I will instruct you later on how to determine if a claim is invalid for anticipation or obviousness.  You should use these same rules to determine whether or not the "hypothetical claim" would be invalid for anticipation or obviousness.  If you determine that the "hypothetical claim" would

---

[48]     **Intel**: FCBA Model Instruction 3.1d (with statement of the law using "hypothetical claim").  Although ensnarement is a legal issue, Intel requests that the Court include an instruction and seek an advisory verdict from the jury on this issue.  This proposed instruction is supported by the case law.  *See Honeywell Int'l v. Hamilton Sundstrand Corp.*, 370 F.3d 1131 (Fed. Cir. 2004); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359 (Fed. Cir. 2003) (en banc); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001); *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999); *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 676, 684 (Fed. Cir. 1990).

[49]     **AVM**: AVM objects to the inclusion of an instruction on the hypothetical claim for the Doctrine of Equivalents as this is a legal issue for the Court to decide.

have been invalid for anticipation or obviousness, then you must find that there is no

infringement of this particular claim under the doctrine of equivalents.]

**[Intel's Proposal**

## 4.5.  LIMITATIONS ON DIRECT INFRINGEMENT — THE REVERSE

## DOCTRINE OF EQUIVALENTS[5051]

---

[50]    **Intel**: Adapted from *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107 (Fed. Cir. 1985).  In fact, it is well-established that the reverse doctrine of equivalents presents a question of fact.  *See SRI Int'l*, 775 F.2d at 1124 (explaining that the reverse doctrine of equivalents presents a question of fact); *see also Ciena Corp. v. Corvis Corp.*, 334 F. Supp. 2d 598, 604 (D. Del. 2004) ("Noninfringement under the reverse doctrine of equivalents presents a question of fact.").  It would therefore be appropriate for this Court to present the issue of the reverse doctrine of equivalents to the jury.  Intel's proposed instruction is consistent with the case law on the reverse doctrine of equivalents and provides the jury with helpful guidance on how to apply the law to the facts of this case.  *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608-609 (1950); *DePuy Spine, Inc. v. Medtronic Sofamor Danke, Inc.*, 567 F.3d 1314, 1339 (Fed. Cir. 2009); *Scripps Clinic & Research Found. v. Genetech, Inc.*, 927 F.2d 1565, 1581 (Fed. Cir. 1991) (explaining that the purpose of the reverse doctrine of equivalents "is to prevent the unwarranted extension" of a patent's claims "beyond a fair scope of the patentee's invention"), *overruled in part on other grounds by Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009); *SRI Int'l*, 775 F.2d 1107, 1124; *Precision Metal Fabricators, Inc. v. Jetstream Sys. Co., Div of Oerlikon Motch Corp.*, 693 F. Supp. 814, 819 (N.D. Cal. 1988) (applying reverse doctrine of equivalents "where defendants are not gaining the benefit of plaintiff's patents, but their equipment could fall within the literal language of the patents").

[51]    **AVM**: AVM objects to this instruction as the issue is subject to AVM's motion for summary judgment regarding Intel's reverse doctrine of equivalents defense (D.I. 404-405).  Additionally, this is an equitable doctrine which should be decided by the Court, not the jury.  *See Ciena Corp. v. Corvis Corp.*, No. 00-662-JJF, 2004 WL 253481, at *2 (D. Del. Feb. 6, 2004) (reverse DOE is grounded in equity and does not require trial to a jury); *see also Izumi Prod. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 598 n.2 (D. Del. 2004) (Robinson, J.) (citing *Ciena Corp.* for the proposition that "a reverse doctrine of equivalents defense is grounded in the rules of equity and is not required to be submitted to a jury for decision."), *aff'd*, 140 F. App'x 236 (Fed. Cir. 2005).  If, however, the Court is inclined to include an instruction on the reverse doctrine of equivalents, AVM proposes the following:

> If a company makes, uses, sells, offers to sell within, or imports into the United States a product that meets all of the requirements of a claim and thus literally infringes that claim, the company is not liable for infringement if the requirements of the "reverse doctrine of equivalents" are satisfied.  The reverse doctrine of equivalents applies if there is a claim limitation that is literally met by an element in Intel's Accused Product, but the

If a company makes, uses, sells, offers to sell within, or imports into the United States a product that meets all of the requirements of a claim and thus infringes that claim, the company is not liable for infringement if the requirements of the "reverse doctrine of equivalents" are satisfied.

Under the reverse doctrine of equivalents, even if AVM establishes that a claim limitation is literally met by an element in the Accused Products , the Accused Products still do not infringe if they are so far changed in principle from the patented invention that they perform the same or similar function in a substantially different way.   The purpose of the reverse doctrine of equivalents is to prevent the unwarranted extension of a patent's claims beyond a fair scope of the patentee's invention.

In determining whether the reverse doctrine of equivalents applies to preclude a finding of literal infringement, you should consider the following four criteria: (1) the principle of the claimed invention; (2) the principle of the accused product or process; (3) the degree of change in the principle of the accused product or process from that of the claimed invention; and (4) whether the accused product or process performs in a substantially different way.   The reverse doctrine of equivalents applies to individual limitations of a patent claim such that if you find that any element of the Accused Products is so far changed in principle from a patented limitation that it performs the same or similar function in a substantially different way, you should find that Intel is not liable for infringement.]

---

element in the Accused Product performs the same or similar function in a substantially different way.  In determining whether the reverse doctrine of equivalents applies, Intel's intent to include that element is irrelevant.  Accidental infringement is still infringement. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107 (Fed. Cir. 1985); *DePuy Spine, Inc. v. Medtronic Sofamore Danek, Inc.*, 567 F.3d 1314, 1338 (Fed. Cir. 2009).

**4.6     INDIRECT INFRINGEMENT—ACTIVE INDUCEMENT[52]**

AVM alleges that Intel is liable for infringement by actively inducing others to directly infringe the '547 patent literally or under the doctrine of equivalents. As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

Intel is liable for active inducement of a claim only if AVM proves by a preponderance of the evidence:

(1) that the acts are actually carried out by others and directly infringe that claim;

(2) that Intel took action during the time the '547 patent was in force intending to cause the infringing acts by others; and

(3) that Intel was aware of the '547 patent and knew that the acts, if taken, would constitute infringement of that patent.

If you find that Intel was aware of the patent, but believed that the acts it encouraged did not infringe that patent, Intel cannot be liable for inducement. In order to establish active inducement of infringement, it is not sufficient that others directly infringe the claim. Nor is it sufficient that Intel was aware of the act(s) by others that allegedly constitute the direct infringement. Rather, in order to find active inducement of infringement, you must find that Intel specifically intended others to infringe the '547 patent. **[AVM's Proposal:** However, a belief as to invalidity of the '547 patent is not a defense to induced infringement.[53]][54]

---

[52]    Adapted from FCBA Model Instruction 3.2

[53]    **AVM**: *Commil USA, LLC v. Cisco Sys.*, 135 S. Ct. 1920, 1929 (2015)

[54]    **Intel**: AVM's additional sentence is unnecessary, and is therefore prejudicial and confusing. Intel is not arguing that a belief as to invalidity would serve as a defense to induced infringement, so this sentence addresses an issue that is not applicable to this case. This sentence does not appear in FCBA Model Instruction 3.2, and Intel objects to its inclusion here.

## 4.7.   INDIRECT   INFRINGEMENT—CONTRIBUTORY   INFRINGEMENT[55]

AVM argues that Intel is liable for contributory infringement by contributing to the direct infringement of the '547 patent by others. As with direct infringement, you must determine contributory infringement on a claim-by-claim basis.

Intel is liable for contributory infringement of a claim if AVM proves by a preponderance of the evidence:

(1) Intel sells, offers to sell, or imports within the United States a component of a product, or apparatus for use in a process, during the time the '547 patent is in force;

(2) the component or apparatus has no substantial, noninfringing use;

(3) the component or apparatus constitutes a material part of the invention;

(4) Intel is aware of the '547 patent and knows that the product for which the component or apparatus has no other substantial use may be covered by a claim of the '547 patent or may satisfy a claim of the '547 patent under the doctrine of equivalents; and

(5) that use directly infringes the claim.

In order to prove contributory infringement, AVM must prove that each of the above requirements is met. This proof of each requirement must be by a preponderance of the evidence, i.e., that it is more likely than not that each of the above requirements is met.

---

[55]    FCBA Model Instruction 3.3

### 4.8.  WILLFUL INFRINGEMENT[56]

In this case, AVM argues both that Intel infringed and, further, that Intel infringed willfully.  If you have decided that Intel has infringed, you must go on and address the additional issue of whether or not this infringement was willful.  Willfulness requires you to determine whether AVM proved that it is more likely than not that the infringement by Intel was especially worthy of punishment.  You may not determine that the infringement was willful just because Intel knew of the '547 patent and infringed it.  Instead, willful infringement is reserved for only the most egregious behavior, such as where the infringement is malicious, deliberate, consciously wrongful, or done in bad faith.

To determine whether Intel acted willfully, consider all facts. These may include, but are not limited, to:

(1) Whether or not Intel acted consistently with the standards of behavior for its industry;

(2) Whether or not Intel intentionally copied a product of AVM that is covered by the '547 patent;

(3) Whether or not Intel reasonably believed it did not infringe or that the patent was invalid **[AVM's Proposal**: at the time of first infringement[57]][58];[59];[60]

---

[56]    FCBA Model Instruction 3.10 as modified for this case.  *See also* 35 U.S.C. § 284; *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S.Ct. 1923, (2016) (preponderance of the evidence standard for finding willfulness); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir. 1999) (knowledge of the patent necessary to show willfulness and explaining, in the context of willful infringement, that "the patent law encourages competitors to design or invent around existing patents"); *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992) (identifying factors that indicate the degree of an infringer's culpability).

This proposal is subject to Intel's motion for summary judgment of no willful infringement and no enhanced damages (D.I. 421), and Intel's position that the question of willfulness should not go to the jury because evidence of Intel's allegedly "willful" conduct is not relevant to any issue that the jury must decide (JPTS, Ex. 5, Intel's Statement of Law To Be Litigated).

[57]    **AVM**:  This is the law under *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S.Ct. 1923, 1927 (2016) (noting that culpability for willfulness is measured against the actor's

(4) Whether or not Intel made a good-faith effort to avoid infringing the '547 patent, for example, whether Intel attempted to design around the '547 patent; and

(5) Whether or not Intel tried to cover up its infringement.

AVM must prove willfulness by a preponderance of the evidence.

## 5. INVALIDITY

[**AVM's proposal:** [61]

I will now instruct you on the rules you must follow in deciding whether or not Intel has proven that the asserted claims of the '547 patent are invalid. Each claim is presumed valid, and is presumed valid independently of other claims.[62]  To prove that any claim of the patent is invalid, Intel must persuade you by clear and convincing evidence, i.e., you must be left with a clear conviction that the claim is invalid.][63]

---

knowledge at the time of the challenged conduct).  Prior to *Halo*, Courts looked to whether defenses were reasonable.  *Halo* makes clear that an after-the-fact defense (even if reasonable) is irrelevant.

[58]   **Intel**: Intel objects to AVM's proposed language, which does not appear in FCBA Model Instruction 3.10.  The language is unnecessary, confusing, and prejudicial.  It is prejudicial by suggesting infringement instead of alleged infringement.  And it is confusing in light of AVM's prior infringement allegations in *AVM1*.  Finally, AVM is not seeking damages (and therefore cannot seek enhancement) until 2010, which is later than the first alleged infringement.

[59]   **AVM**:  At the April 10 summary judgment hearing, Intel appeared to suggest that it would rely upon a good faith defense.  If Intel attempts to do this, it will have selectively waived privilege and work product protection.  AVM reserves the right to object to any such testimony on that ground, as well as to propound any necessary curative instructions.

[60]   **Intel**:  Intel objects to AVM's suggestion that Intel will "have selectively waived privilege and work product protection."  Intel has not and will not waive privilege and is entitled to defend itself against any allegations by AVM, including by demonstrating that Intel acted reasonably and in good faith.

[61]   **AVM**: FCBA Model Instruction 4.10 with the exception of second sentence

[62]   **AVM**: 35 U.S.C. § 282.

[63]   **Intel**: AVM modifies FCBA Model Instruction 4.10 by including a policy argument regarding the reason behind the clear and convincing evidence standard.  The sentence regarding

[**Intel's Proposal:** [64]

I will now instruct you on the rules you must follow in deciding whether or not Intel has proven that the asserted claims of the '547 patent are invalid.  Even though the Patent Office examiner has allowed the claims of the '547 patent, you have the responsibility for deciding whether the claims of the patent are valid."[65]  To prove that any claim of the patent is invalid, Intel must persuade you by clear and convincing evidence.

Corroborating evidence of invalidity can include documents and testimonial evidence.  Circumstantial evidence can be sufficient.  A prior-art inventor's testimony may be corroborated by other testimony, and thus invalidity may be determined even in the absence of documentary evidence.[66]]

---

patents being presumed valid is sufficiently covered by the clear and convincing evidence standard.  Inclusion of this sentence is prejudicial.  In addition, AVM modifies the last sentence of FCBA Model Instruction 4.10 by adding language "i.e., you must be left with a clear conviction that the claim is invalid."  This language also is unnecessary, confusing, and prejudicial.

[64]     **Intel**: Adapted from FCBA Model Instruction 4.10 with modifications where noted.

[65]     **Intel**: *AVM1*, D.I. 246 at 16-17.  The parties jointly proposed this sentence in the previous case, the sentence is an accurate statement of law, and it is appropriate for the Court to give this sentence in this case to clarify the jury's role in deciding whether the asserted claims are invalid or not.

[66]     **Intel**: The additional sentences regarding corroborating evidence of invalidity are relevant to the issues in this case—because AVM has suggested that documentary evidence is required to support Intel's invalidity case—and they are supported by the case law.  *See TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1301 (Fed. Cir. 2016) (explaining that "corroborating evidence [of invalidity] can include documents and testimonial evidence"); *see also Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp. 2d 544, 555 (E.D. Va. 2010) (explaining that "an inventor's testimony may be corroborated by other testimony, and thus invalidity may be determined even in the absence of documentary evidence").

### 5.1. PRIOR ART[67]

Under the patent laws a person is granted a patent only if the invention claimed in the patent is new and not obvious in light of what came before.  That which came before is referred to as the "prior art." **[AVM's Proposal:** [68]  Intel must prove, by clear and convincing evidence, that these items are prior art.  In order to do so, Intel must prove that these items fall within one or more of the different categories of prior art recognized by the patent laws.[69] These categories are:][70]

[**Intel's Proposal:**  Prior art includes any of the following items:]

    1. patents that issued before December 20, 1996;

---

[67]    Adapted from FCBA Model Instruction B.4.3a-1 and *AVM1*, Dkt. 246 at 17-18.

[68]    **AVM**: *AVM1*

[69]    **AVM**: Judge Robinson's model patent jury instructions; *see also Amway Corp. v. Nartron Corp.*, 16 F.3d 420 (Fed. Cir. 1993) ("The party asserting the on sale bar must prove by clear and convincing evidence that there was a definite sale or offer to sell more than one year before the filing of the application for the subject patent.").

[70]    **Intel**: AVM's instruction that "Intel must prove, by clear and convincing evidence, that these items are prior art" is prejudicial because it unnecessarily repeats the clear-and-convincing standard when there is no legitimate dispute that the references Intel has cited are prior art. Intel's product prior-art (e.g., the P6/Pentium Pro microprocessor) was undisputedly on-sale before the critical date, and as explained below, there is no requirement that such "on sale" products be enabling, so there should be no dispute that these products constitute prior art under § 102(b).

Further, although AVM has argued that other cited patent art does not constitute prior art because it is not enabled, the burden is undisputedly on *AVM*, not Intel, to present "persuasive" evidence that such a prior-art patent or publication is not enabled.  *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354-55 (Fed. Cir. 2003) ("We hold that an accused infringer should be similarly entitled to have the district court presume the enablement of unclaimed (and claimed) material in a prior art patent defendant asserts against a plaintiff."); *see also In re Antor Media Corp.*, 689 F.3d 1282, 1287 (Fed. Cir. 2012) ("[B]oth claimed and unclaimed materials disclosed in a patent are presumptively enabling.").

AVM's proposed instruction emphasizing *Intel's* burden to show that items constitute prior art is therefore irrelevant to this case, contrary to the law, and prejudicial to Intel by unnecessarily repeating the clear-and-convincing standard.

2. printed publications published before December 20, 1996;

3. patents granted on applications that were filed in the United States before December 20, 1996; and

4. any product that was "on sale" in the United States before December 20, 1995 – that is, it was "on sale" one year before the application for the '547 patent was filed on December 20, 1996.

**[AVM's Proposal:** Testimony of prior public use must be corroborated in order to invalidate a patent.[71] To be considered "on-sale" for purposes of prior art, a product must have been subject to a commercial sale or offer for sale. A commercial "offer for sale" existed only if it was sufficiently definite and detailed, including for a specific price, that a binding contract could have been created simply by someone accepting the "offer."][72]

---

[71]      **AVM**: *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737–38 (Fed. Cir. 2002) (citing *Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1366–68, (Fed. Cir. 1999)).

[72]      **Intel**: AVM's instruction regarding prior public use and offers for sale is prejudicial because there is no dispute regarding either of these issues.  Intel's product prior-art (e.g., the P6/Pentium Pro microprocessor) was undisputedly on-sale before the critical date.  AVM's proposed instruction regarding prior public use and offers for sale is therefore irrelevant to this case and prejudicial to Intel.

**[Intel's Proposal:**

## 5.2.    CONSIDERED OR NOT CONSIDERED BY THE PATENT OFFICE[73]

When a party challenging the validity of a patent relies on prior art that was considered by the Patent Office examiner during the prosecution of the application which resulted in the issued patent, that party's ability to satisfy its clear-and-convincing evidence burden may be more difficult.  When a party challenging the validity of a patent presents evidence that was not considered by the Patent Office examiner during the prosecution of the application which resulted in the issued patent, such new evidence may be given more weight and may make it easier to satisfy that party's clear-and-convincing evidence burden.]

### 5.3. ANTICIPATION[74]

In order for someone to be entitled to a patent, the invention must actually be "new."  In general, inventions are new when they have not been made, used, or disclosed before. In this case, Intel contends that each of the Asserted Claims is not new. [75]

---

[73]    **Intel**: Intel's instruction properly explains that prior art not considered by the USPTO may make an alleged infringer's burden of proving invalidity easier to sustain. The Supreme Court was clear in *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011), that when new evidence not considered by the PTO is presented, an alleged infringer's "burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain," and that "a jury instruction on the effect of new evidence can, and when requested, most often should be given." *Id.* at 2251; *see also id.* ("New evidence supporting an invalidity defense may 'carry more weight' in an infringement action than evidence previously considered by the PTO." (citation omitted)).

[74]    Adapted from FCBA Model Instruction 4.3b-1, *AVM1*, and 2016 AIPLA Model Jury Instruction § 6.0.

[75]    FCBA Model Instruction 4.3b-1 as updated for this case; *AVM1*

Invalidity by anticipation requires the presence in a single prior art disclosure of all requirements, or limitations, of a claimed invention arranged as in the claim. For a claim to be anticipated, each claim limitation must be disclosed, either expressly or inherently, in a single prior art reference, and arranged or combined in the same way as recited in the claim.  You may not combine two or more items of prior art to find anticipation.  In determining whether every one of the elements of the claimed invention is found in a prior publication or patent, you should take into account what a person of ordinary skill in the art would have understood from his or her review of the particular publication or patent.[76]

**[AVM's Proposal:**

If the prior art reference is a patent, you may consider the drawings in the patent. However, patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.[77]] [78]

In determining whether the single item of prior art anticipates a patent claim, you should take into consideration not only what is expressly disclosed in the particular prior art reference but also what is inherently present or disclosed in that prior art or inherently results from its practice. Prior art inherently anticipates a patent claim if the missing element or feature would

---

[76]     *AVM1*, Dkt. 246 at 20.

[77]     **AVM**: This instruction is necessary because one of Intel's prior art references raises the issue of what is disclosed in the drawings of a prior art reference.  Failing to instruct the jury on the proper use of such drawings is prejudicial to AVM and will likely confuse the jury. *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000).

[78]     **Intel**: Intel objects to AVM's proposed language regarding drawings in a patent as unnecessary, confusing, and prejudicial.  These sentences are arguments by AVM against prior art references on which Intel relies.  Such arguments are not appropriate for jury instructions, and the Court should therefore reject these sentences.

necessarily result from what the single item of prior art teaches to persons of ordinary skill in the art. A party claiming inherent anticipation must prove by clear and convincing evidence that the allegedly inherent element necessarily is present.

Evidence outside of the prior art reference itself may be used to show that elements that are not expressly disclosed in the reference are inherent in it.  In order to be inherent, the feature that is alleged to have been inherent must necessarily have existed in the prior art reference. The fact that it was likely is not sufficient. It is not required, however, that persons of ordinary skill actually recognize or appreciate the inherent disclosure at the time the prior art was first known or used.  Thus, the prior use of the patented invention that was unrecognized and unappreciated can still be an invalidating anticipation, provided the allegedly inherent feature was necessarily present in the reference.

A prior art patent or publication cannot anticipate (or render obvious, as discussed in the following instruction) a claimed invention if the disclosure in the prior-art patent or publication is not enabled.  That is, the prior art patent or publication must disclose sufficient information to enable or teach a person of ordinary skill in the art to practice the invention without undue experimentation.  A prior art patent or publication is presumed to be enabled, and AVM therefore has the burden of presenting persuasive evidence that a prior-art patent or publication is not enabled.  Intel retains the burden of proving that the '547 patent is invalid.[79]

---

[79]     *AVM1*, D.I. 246 at 22; *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354-55 (Fed. Cir. 2003) ("We hold that an accused infringer should be similarly entitled to have the district court presume the enablement of unclaimed (and claimed) material in a prior art patent defendant asserts against a plaintiff."); *see also In re Antor Media Corp.*, 689 F.3d 1282, 1287 (Fed. Cir. 2012) ("[B]oth claimed and unclaimed materials disclosed in a patent are presumptively enabling.").

43

In deciding whether a person having ordinary skill would have to experiment unduly in order to make and use the invention, you may consider several factors:

(1)      the quantity of experimentation necessary;

(2)      the amount of direction or guidance presented;

(3)      the presence or absence of working examples;

(4)      the nature of the invention;

(5)      the state of the prior art;

(6)      the relative skill of those in the art;

(7)      the predictability or unpredictability of the art; and

(8)      the breadth of the claims.[80]

---

[80]      *AVM1*; *see also In re Wands*, 858 F.2d 731 (Fed. Cir. 1988)).

### 5.4.    ON SALE BAR

[**AVM Proposal:**[81]    Intel contends that asserted claims of the '547 patent were anticipated because the inventions defined in those claims were on sale in the United States before December 20, 1995.

A patent claim is invalid if more than one year before the filing date of the patent an embodiment of the claimed invention was both: (1) the subject of a commercial sale or offer for sale in the United States; and (2) ready for patenting.

A commercial "offer for sale" was made if another party could make a binding contract by simply accepting the offer. An invention was subject to an "offer for sale" if the claimed invention was embodied in an item that was actually sold or offered for sale. It is not required that a sale was actually made. The essential question is whether there was an attempt to obtain a commercial benefit from the invention.

The invention also must have been "ready for patenting" more than one year before the filing date of the patent. An invention is ready for patenting either when it is reduced to practice or when the inventor has prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person of ordinary skill in the art to practice the invention. An

---

[81]    **AVM**: AIPLA Model Jury Instruction § 6.3.1, which cites to:  35 U.S.C. § 102(b) (pre-AIA); Pfaff v. Wells Elecs., 525 U.S. 55, 67-68 (1998); August Tech v. Camtek, 655 F.3d 1278, 1288-89 (Fed. Cir. 2011); Atlanta Attachment Co. v. Leggett & Platt, Inc., 516 F.3d 1361, 1365 (Fed. Cir. 2008); Board of Educ. ex rel Bd. of Trustees of Fla. State Univ. v. Am. Bioscience, Inc., 333 F.3d 1330, 1338 (Fed. Cir. 2003) (as to conception); Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1352-55 (Fed. Cir. 2002); Linear Tech. Corp. v. Micrel, Inc., 275 F.3d 1040, 1047-54 (Fed. Cir. 2001); Robotic Vision Sys., Inc., v. View Eng'g, Inc., 249 F.3d 1307, 1312 (Fed. Cir. 2001); Grp. One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045-49 (Fed. Cir. 2001; Abbott Labs. v. Geneva Pharms., Inc., 182 F.3d 1315, 1319, (Fed. Cir. 1999); Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed. Cir. 1998) (as to reduction to practice); WL Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1549-50 (Fed. Cir. 1983).

invention is reduced to practice when it has been (1) constructed or performed within the scope of the patent claims; and (2) determined that it works for its intended purpose. The claimed invention is ready for patenting when there is reason to believe it would work for its intended purpose.][8283]

[**Intel Proposal:**[84]   Intel contends that the asserted claims of the '547 patent were anticipated.   One of Intel's contentions is that the asserted claims are anticipated because the

---

[82]    **AVM:** AVM's proposal is the AIPLA Model Jury Instruction § 6.3.1. This instruction is needed because, with respect to the alleged P6 prior art, the parties dispute whether alleged evidence of structure and operation of the P6 reflects the P6 as it was commercially sold. Additionally, AVM objects to Intel's proposal as it does not fully describe the law regarding the on-sale bar and is slanted in Intel's favor thus prejudicing AVM.

[83]    **Intel**: Intel objects to AVM's proposal as confusing and prejudicial.  For example, AVM's proposed language seeks to instruct the jury as to what constitutes a commercial offer for sale.  However, there is no legitimate dispute that Intel's product prior-art (e.g., P6/Pentium Pro microprocessor) was on-sale before the critical date.  The language regarding being "ready for patenting" is also confusing, prejudicial, and legally erroneous.  There is no requirement that "on sale" products be enabling, so there should be no dispute that these products constitute prior art under § 102(b). *See Zenith Electronics Corp. v. PDI Communication Sys., Inc.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008) (third-party sale that "embodies the invention" gives rise to "on sale bar" regardless of whether sale "discloses" or "enables" invention); *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) (in on-sale bar context, "there is no requirement for an enablement-type inquiry" to determine whether the sale taught the invention to the public), citing *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1583 (Fed. Cir. 1986) ([T]he question is not whether the sale, even a third party sale, 'discloses' the invention at the time of the sale, but whether the sale relates to a device that embodies the invention.")); *see also Pixion, Inc. v. Citrix Sys., Inc.*, 09-cv-03496, 2012 WL 3313533 at *10 (N.D. Cal. Aug. 13, 2012) (Federal Circuit has established that "[w]ith respect to a prior art reference that is a device rather than a publication, public use itself need not be enabling.") (citations and internal quotation marks omitted).  However, AVM's proposed language seeks to create an enablement requirement for the on-sale bar.

[84]    **Intel**: This instruction is necessary to explain the specific requirements of the on-sale bar under 35 U.S.C. § 102(b), which renders a patent invalid if the invention was "on sale" in the United States more than one year prior to the date of the patent application.  This instruction recites black-letter law and should be helpful to the jury in clarifying the requirements of § 102(b).  *See Zenith Electronics Corp. v. PDI Communication Sys., Inc.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008) (third-party sale that "embodies the invention" gives rise to "on sale bar" regardless of whether sale "discloses" or "enables" invention); *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) (in on-sale bar context, "there is no requirement for an enablement-type inquiry"

claimed invention defined in those claims was on sale in the United States before December 20, 1995.

Under the "on-sale bar," a patent claim is invalid if a product embodying the claimed invention was subject to a commercial sale or offer for sale in the United States more than one year before the filing date of the patent.  In other words, if a product that inherently possessed each of the limitations of a patent claim was either sold or offered for sale in the United States during that time period, then the sale or offer for sale of the prior-art product invalidates that patent claim.  This is true whether or not it was recognized at the time that the prior-art product possessed the claimed characteristics.  There is no requirement that the prior-art product enable a person of ordinary skill in the art to practice the claimed invention.]

### 5.5. OBVIOUSNESS[85]

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made. Intel may establish that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of technology of the patent.

---

to determine whether the sale taught the invention to the public), citing *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1583 (Fed. Cir. 1986) ([T]he question is not whether the sale, even a third party sale, 'discloses' the invention at the time of the sale, but whether the sale relates to a device that embodies the invention.")); *see also Pixion, Inc. v. Citrix Sys., Inc.*, 09-cv-03496, 2012 WL 3313533 at *10 (N.D. Cal. Aug. 13, 2012) (Federal Circuit has established that "[w]ith respect to a prior art reference that is a device rather than a publication, public use itself need not be enabling.") (citations and internal quotation marks omitted).

[85]    Adapted from FCBA Model Instruction 4.3c.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of technology of the patent that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. In considering whether a claimed invention is obvious, you may but are not required to find obviousness if you find that at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field of technology of the patent to combine the known elements in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; and (6) whether the change resulted more from design incentives or other market forces.  To find it rendered the invention obvious, you must find that the prior art provided a reasonable expectation of success.

In making these assessments, you should take into account any objective evidence (sometimes called "secondary considerations") that may shed light on the obviousness or not of the claimed invention, such as:

a. Whether the invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities);

b. Whether the invention satisfied a long-felt need;

c. Whether others had tried and failed to make the invention;

d. Whether others invented the invention at roughly the same time;

e. Whether others copied the invention;

f. Whether there were changes or related technologies or market needs contemporaneous with the invention;

g. Whether the invention achieved unexpected results;

h. Whether others in the field praised the invention;

i. Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the invention;

j. Whether others sought or obtained rights to the patent from the patent holder; and

k. Whether the inventor proceeded contrary to accepted wisdom in the field.

### 5.6 WRITTEN DESCRIPTION REQUIREMENT[86]

The patent law contains certain requirements for the part of the patent called the specification.  Intel contends that the asserted claims of the '547 patent are invalid because the specification of the '547 patent does not contain an adequate written description of the invention. To succeed, Intel must show by clear and convincing evidence that the specification fails to meet the law's requirements for written description of the invention.

**[AVM's Proposal:**

In the patent application process, the applicant may keep the originally filed claims, or change the claims between the time the patent application is first filed and the time a patent is issued. An applicant may amend the claims or add new claims. These changes may narrow or broaden the scope of the claims. The written description requirement ensures that the issued claims correspond to the scope of the written description that was provided in the original application.][87][88]

---

[86]    35 U.S.C. § 112, ¶¶ 1, 2; *Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.,* 598 F.3d 1336 (Fed. Cir. 2010) (en banc); *Lizard Tech., Inc. v. Earth Res. Mapping Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005); *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 929 (Fed. Cir. 2004); *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253-55 (Fed. Cir. 2004); *Purdue Pharma L.P. v. Faulding, Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) (patent's specification must include an adequate written description; however, it need not include the exact words of the claim); *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1377-78 (Fed. Cir. 2000); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1478-80 (Fed. Cir. 1998); *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997); *In re Alton*, 76 F.3d 1168, 1172 (Fed. Cir. 1996).

[87]    **Intel**: Intel objects to this paragraph about the patent application process as unnecessary and confusing.  This paragraph does not add anything to the written description section, and therefore has the potential to confuse the jury.  The joint proposal already includes sufficient language to inform the jury as to the written description requirement.

[88]    **AVM**:  As evidenced from the summary judgment briefing, one of the key issues the parties' experts focus on is the extent that the originally-filed claims support the written

In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent when the application was filed. The written description requirement is satisfied if a person having ordinary skill reading the original patent application would have recognized that it describes the full scope of the claimed invention as it is finally claimed in the issued patent, [**Intel Proposal**:[89] and that the inventor actually invented that full scope by the filing date of the original application].[90]

The specification includes all of the written words in the patent, including the claims, as originally filed, and the drawings.[91] The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent application. The full scope of a claim or any particular requirement in a claim need not be expressly disclosed in the original patent application if a person having ordinary skill in the field

---

description. This paragraph is needed to make clear that the jury must consider those claims. Both parties agree this is the law.

[89] **Intel**: Consistent with the party's prior submission in *AVM1* and case law, Intel proposes that the Court instruct the jury that the written description requirement requires that the inventor actually invented that full scope by the filing date of the original application. AVM1, Dkt. 246 at 32 ("The written description requirement helps to ensure that the patent applicant actually invented the claimed subject matter."); *see also Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) ("[T]he specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed."); *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (finding failure to meet written description requirement where "a person of skill in the art would not understand how to make a seamless DWT generically and would not understand LizardTech to have invented a method for making a seamless DWT").

[90] **AVM**: AVM believes that Intel's remaining additions will confuse the jury into thinking more is needed than an objective inquiry into the disclosure from the perspective of one of ordinary skill in the art. *See Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

[91] *AVM1*, Dkt. 246 at 32 ("The specification includes all of the written words in the patent, including the claims, as originally filed, and the drawings").

of technology of the patent at the time of filing would have understood that the full scope or missing requirement is in the written description in the patent application.

### 5.7.  LEVEL OF ORDINARY SKILL IN THE ART[92]

In deciding what the level of ordinary skill in the field of invention is, you should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; and (5) the sophistication of the technology.

---

[92]     FCBA Model Instruction 4.3c(i).

**[Intel's Proposal**

### 5.8. INDEFINITENESS[93]

Intel contends that the asserted claims of the '547 patent are invalid because they are "indefinite." The test for determining whether the claims are sufficiently definite is whether the patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. If a patent does not meet this requirement, then the claim is said to be indefinite, and the claim is invalid.]

### 5.9. UTILITY

Intel has alleged that AVM's '547 patent is invalid for lack of utility. To satisfy the utility requirement, a patent need only be useful to some extent and in certain applications: The fact that an invention has only limited utility and is only operable in certain applications is not grounds for finding lack of utility.[94] All that is necessary for a patent to be valid as useful is that the invention be capable of providing some identifiable benefit.[95] **[Intel's Proposal:** The benefit must be specific and substantial.[96] A substantial benefit is one that provides practical

---

[93]    **Intel**: Although Intel recognizes that the issue of indefiniteness is an issue of law for the Court, which the Court should resolve in Intel's favor on summary judgment (D.I. 415), if the Court declines to resolve this issue on summary judgment, it would be appropriate to include an instruction for the jury to provide an advisory verdict. This proposed instruction is consistent with the law as articulated in the recent Supreme Court decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

[94]    *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1180 (Fed. Cir. 1991) (*citing Envirotech Corp. v. Al George, Inc*., 730 F.2d 753, 762 (Fed. Cir. 1984)).

[95]    *Juicy Whip, Inc. v. Orange Bang, Inc*., 185 F.3d 1364, 1366 (Fed.Cir.1999).

[96]    **Intel**: *In re Fisher*, 421 F.3d 1365, 1371 (Fed. Cir. 2005) (explaining that a claimed invention is required "to have a specific and substantial utility to satisfy § 101").

utility and real world utility.[97] To satisfy the substantial utility requirement, the patent must have

a significant and presently available benefit to the public.[98]  A specific benefit is a use that is not

so vague as to be meaningless.[99]  To satisfy the specific utility requirement, an asserted use must

also show that the claimed invention can be used to provide a well-defined and particular benefit

to the public.[100]][101][102]

---

[97]     **Intel**: *In re Fisher*, 421 F.3d 1365, 1371 (Fed. Cir. 2005) ("Courts have used the labels 'practical utility' and 'real world' utility interchangeably in determining whether an invention offers a 'substantial' utility.").

[98]     **Intel**: *In re Fisher*, 421 F.3d 1365, 1371 (Fed. Cir. 2005) ("[T]o satisfy the 'substantial utility requirement, an asserted use must show that that claimed invention has a significant and presently available benefit to the public.").

[99]     **Intel**: *In re Fisher*, 421 F.3d 1365, 1371 (Fed. Cir. 2005) ("Turning to the 'specific' utility requirement, an application must disclose a use which is not so vague as to be meaningless.).

[100]     **Intel**: *In re Fisher*, 421 F.3d 1365, 1371 (Fed. Cir. 2005) ("[A]n asserted use must also show that that claimed invention can be used to provide a well-defined and particular benefit to the public."

[101]     **AVM:** Intel's instruction—in particular its use of "substantial"—will confuse the jury. *In re Fischer* makes clear that "substantial utility" is the Federal Circuit short-hand for a "practical" or "real world" utility. *In re Fisher*, 421 F.3d 1365, 1371 (Fed. Cir. 2005). This issue comes up in chemical cases, where gene and chemical compound patents. In contrast to mechanical or electrical engineering discoveries, which typically are developed with a use in mind, many chemical compounds and gene discoveries are developed without knowing how they will be used.  That is an irrelevant inquiry in this case:  both parties agree that the '547 patent can be used in dynamic logic circuits.  That is a "practical" use.  Intel's instruction will mislead the jury into thinking that the test for utility is much more rigorous than it actually is.

[102]     **Intel**: Intel's proposed language is necessary to provide a full explanation of the utility standard.  Under applicable Federal Circuit precedent, a patent is invalid under § 101 if it fails to provide a well-defined and real-world benefit to the public.  *See Fisher*, 421 F.3d at 1371-1372. The Federal Circuit has emphasized that the benefit must be "specific" and "substantial," and that a substantial benefit is one that provides "practical utility" and "real world" utility. *Id.* at 1371.  "Simply put, to satisfy the 'substantial' utility requirement, an asserted use must show that the claimed invention has a significant and presently available benefit to the public." *Id.*  The Federal Circuit's *Fisher* decision provides the governing standard for this Court to apply.

**[AVM's Proposal:** Intel, as the party challenging utility, must show by clear and convincing evidence that that the claimed invention is totally incapable of achieving a useful result.[103]  If a patent does not meet the utility requirement, then the patent is invalid.][104]

**[Intel's Proposal:** [105]   Intel, as the party challenging utility, must show by clear and convincing evidence that the claimed invention lacks utility.  If a patent does not meet the utility requirement, then the patent is invalid.]

---

[103]    **AVM**: Intel objects to this language as "argumentative and unnecessary."   Yet, it is simply the legal test for utility.  *See Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1571 (Fed. Cir. 1992) (stating the invention lacks utility if it is "totally incapable of achieving a useful result"); *see also CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1339 (Fed. Cir. 2003) (the party claiming a patent is not useful "must show that all disclosed alternatives are inoperative or not enabled").

[104]    **Intel**: Intel objects to AVM's proposed language as unfairly prejudicial to Intel.  AVM's language regarding "totally incapable of achieving a useful result" is argumentative and unnecessary.

[105]    **Intel**: Unlike AVM's proposal, Intel's proposal is fair to both sides.  AVM's instruction which substitutes "totally incapable of achieving a useful result" for "lacks utility" would unfairly prejudice Intel.  The instruction already provides the standard for utility, and there is no reason to include this language in the final paragraph of the instruction.

## 6. DAMAGES

If you find that the Accused Products infringe any of the Asserted Claims, and that those claims are not invalid, you must determine the amount of damages to be awarded AVM for the infringement. On the other hand, if you find that each of the asserted patent claims is either invalid or is not infringed, then you need not consider damages in your deliberations.

AVM must prove each element of its damages—including the amount of the damages—by a preponderance of the evidence, which means more likely true than not.

[**AVM's Proposal:**[106]   If you find that AVM has established infringement of a valid claim, AVM is entitled to at least a reasonable royalty to compensate it for that infringement. The damage award cannot be less than a reasonable royalty.  A reasonable royalty is the reasonable amount that someone wanting to use the patented invention would have agreed to pay to the patent owner and the patent owner would have accepted.  A royalty is a payment made to a patent owner by someone else in exchange for the rights to make, use, sell, or import a patented product.

The reasonable royalty award must be based on the incremental value that the patented invention adds to the end product. When the infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by the

---

[106]    **AVM**: 35 U.S.C. § 284; *Ericsson, Inc. v. D-Link Syss., Inc.*, No. 10-CV-0473, 2014 U.S. App. LEXIS 22778 *at \*53, 54* (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1998) *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge v. Dana Corp.,* 383 F.3d 1337, 1342 (Fed. Cir 2004); *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996); *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1554 (Fed. Cir. 1995) (*en banc*).

patented features. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.][107]

[**Intel's Proposal**:[108]

---

[107]  **AVM**:  AVM's proposed instruction is consistent with the law and is focused on the nature of a reasonable royalty.  Because Intel has incorporated AVM's second paragraph into one of its other instructions, and Intel's proposed instruction acknowledges that damages cannot be less than a reasonable royalty, Intel's only dispute seems to be with the statement that "[a] reasonable royalty is the reasonable amount that someone wanting to sue the patented invention would have agreed to pay to the patent owner and the patent owner would have accepted"—a brief summary of the hypothetical negotiation framework that follows in later instructions—and a brief definition of a royalty.  These instructions will help the jury understand the proper nature of the damages to be awarded if the jury finds that the Accused Products infringe the '547 patent and that the Asserted Claims of the '547 patent are valid.  Intel's proposed instruction, on the other hand, offers no help to the jury when it states that "[t]he purpose of a damage award is to put AVM in about the same financial position it would have been in if the infringement had not happened."  Moreover, Intel's claim that it has "faithfully" followed the AIPLA instructions is belied by its final sentence, which is unnecessary and duplicative in light of the agreed-upon instruction that AVM must prove damages by a preponderance of the evidence.

[108]  **Intel**:  Intel's proposal, unlike AVM's proposal, faithfully follows AIPLA model instruction 11.0.  AVM and Intel agree that the first two paragraphs of AIPLA model instruction 11.0 should be given to the jury, but AVM then strays from the rest of the AIPLA language in this instruction.  Intel believes it is appropriate for the Court to give the full model instruction. *See also Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009); 35 U.S.C. § 284 (2004); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964); *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381-82 (Fed. Cir. 2003); *Vulcan Eng'g Co. v. FATA Aluminum, Inc.*, 278 F.3d 1366, 1376 (Fed. Cir. 2002); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108-09 (Fed. Cir. 1996); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1544-45 (Fed. Cir. 1995); *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993); *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir 2004); *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326 (Fed. Cir. 1987).  The last paragraph of Intel's proposed instruction regarding proving damages with "reasonable certainty" is from FCBA Model Patent Jury Instruction § 6.1.

Because AVM excerpted several instructions and combined them, its instruction is repetitive, confusing, and potentially prejudicial.  There is no dispute that AVM is entitled to at least a reasonable royalty, and Intel's proposed instruction includes a sentence that "the damages award cannot be less than a reasonable royalty."  The second paragraph of AVM's proposal is

If proven by AVM, damages must be in an amount adequate to compensate AVM for the infringement.  The purpose of a damage award is to put AVM in about the same financial position it would have been in if the infringement had not happened.  But the damage award cannot be less than a reasonable royalty.  You may not add anything to the amount of damages to punish an accused infringer or to set an example.  You also may not add anything to the amount of damages for interest.

The fact that I am instructing you on damages does not mean that the Court believes that one party or the other should win in this case.  My instructions about damages are for your guidance only in the event you find in favor of AVM.  You will need to decide the issue of damages only if you find that one or more of the asserted claims are both not invalid and infringed.

AVM has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that AVM establishes that it more likely than not suffered.  While AVM is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.]

---

included in Intel's next proposed instruction regarding the hypothetical negotiation model.  *See infra* § 6.1.

### 6.1.  REASONABLE ROYALTY DEFINITION – USING THE HYPOTHETICAL NEGOTIATION MODEL

[**AVM's Proposal**:[109]  A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between AVM and Intel. Of course, we know that they did not agree to a license and royalty payment. But, in order to decide on the amount of reasonable royalty damages, you should assume that that the parties did negotiate a license just before the infringement began. This is why it is called a "hypothetical" license negotiation. You should assume that both parties to the hypothetical negotiation understood that the patent was valid and infringed and both were willing to enter into a license. You should also presume that the parties had full knowledge of the facts and circumstances surrounding the infringement at the time of the hypothetical negotiation.][110][111]

---

[109]     **AVM**: AIPLA Model Instruction 11.14; *see also LaserDynamics, Inc. v. Quanta Computer, Inc. et al*, 694 F.3d 51, 75 (Fed. Cir. 2012); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1311 (Fed. Cir. 2011); *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109-10 (Fed. Cir. 1996); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (*en banc*); *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993).

[110]     **AVM:**  AVM's proposed instruction is taken from AIPLA Model Instruction 11.14 and accurately describes the hypothetical negotiation framework.  Intel's claim that the phrase "understood" suggests that infringement or validity have already been resolved is unfounded; in the agreed-upon portion of the prior instruction, the jury is clearly told that it need not consider damages if the asserted patent claims are invalid or not infringed.  Moreover, Intel's proposed term "believed" is inconsistent with the law, which provides that in the hypothetical negotiation the patent-in-suit it is "assumed" the patent was valid and infringed.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009); *MAZ Encryption Techs. LLC v. Blackberry Corp.*, 2016 WL 4490706, at *1 (D. Del. 2016); *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.*, 2004 WL 2213562, at *3 (D. Del. 2004).

Intel's more lengthy jury instruction is flawed in several regards.  Among other things, its reference to a "so-called" reasonable royalty suggests that the reasonable royalty is somehow improper, and the statement that "the royalty may not be limited or increased based on the actual profits the alleged infringer made" is likely to cause confusion.

[**Intel's Proposal**:[112]   In this case, AVM seeks damages in the form of a so-called "reasonable royalty."   A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.   A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of AVM and Intel would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.   In determining this, you must assume that both parties believed that the '547 patent was valid and infringed, and that both parties were willing to enter into an agreement.   The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have

---

[111]    **Intel**:  Intel objects to AVM's proposed instruction on the hypothetical negotiation, and suggests that the Court provide Intel's more complete instruction on this topic (below).  AVM's instruction is confusing and prejudicial.  For example, by instructing the jury that the parties "understood" the patent to be valid and infringed, instead of "believed" the patent to be valid and infringed, AVM suggests to the jury that the issue of infringement and invalidity have been resolved, when in fact it is the jury's responsibility to resolve that issue.  In contrast, Intel's proposed instruction (below), correctly informs the jury that parties to a hypothetical negotiation "believe" that a patent is valid and infringed.  This language is more neutral and does not suggest a verdict for the jury.

[112]    **Intel**: Adapted from FCBA Model Patent Jury Instructions § 6.6; *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) (25% "rule of thumb" inadmissible); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) (per curiam) (licenses must be related to patent at issue to be relevant to a reasonable royalty); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1340 (Fed. Cir. 2009) *cert. denied*, 130 S. Ct. 3324 (2010) (vacating and rewarding jury award as excessive); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108-10 (Fed. Cir. 1996); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579-81 (Fed. Cir. 1996); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc); *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371 (Fed. Cir. 2001); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552 (Fed. Cir. 1984).

preferred.  Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

The reasonable royalty award must be based on the incremental value that the patented invention adds to the end product. When the infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by the patented features. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.]

## 6.2.  REASONABLE ROYALTY—RELEVANT FACTORS

[AVM's Proposal:[113][114]

In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors, in addition to any other evidence presented by the parties on the economic value of the patent:

1.  Any royalties received by the licensor for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

2.  The rates paid by Intel to license other patents comparable to the '547 patent.

3.  The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

---

[113]    **AVM**: AIPLA Model Instruction 11.15 as modified for this case; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, No. 10-CV-0473, 2014 U.S. App. LEXIS 22778 at *65-69 (Fed. Cir. 2014); *LaserDynamics, Inc. v. Quanta Computer, Inc. et al*, 694 F.3d 51, 60 (Fed. Cir. 2012); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-73 (Fed. Cir. 2010); *Monsanto Co. v. McFarling*, 488 F.3d 973 (Fed. Cir. 2007); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108-10 (Fed. Cir. 1996); *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898-900 (Fed. Cir. 1986); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd sub nom.*, *Georgia Pacific Corp. v. United States Plywood Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).

[114] **AVM**: AVM's proposal should be used.  Intel's proposal relies upon the Federal Circuit Bar Association's ("FCBA") new Model Instruction 6.7, which is a significant departure from the *Georgia-Pacific* factors the Federal Circuit and district courts have relied upon to frame the hypothetical negotiation for decades.  More importantly, both of the parties' damages experts employ the *Georgia-Pacific* framework in their damages analyses, and the FCBA instruction is subsumed within the *Georgia-Pacific* framework.  The FCBA factors do not include, for example, any consideration of the extent of the infringer's use of the patented technology, the commercial success of products using the patented technology, or alleged non-infringing alternatives—all issues discussed by the parties' experts.  Although the FCBA instruction includes a catchall for "other factors which in your mind would have increased or decreased the royalty," it is unreasonable to think that a jury will necessarily consider these types of issues without an appropriate instruction.  Accordingly, the Court should use AVM's proposed instruction 6.2, which is based on AIPLA Model Instruction 11.15 and the *Georgia-Pacific* factors.

4. The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5. The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.

6. The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.

7. The duration of the '547 patent and the term of the license.

8. The established profitability of the product made under the '547 patent; its commercial success; and its current popularity.

9. The utility and advantages of the patented invention over the old modes or devices, if any that had been used for achieving similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which Intel has made use of the invention; and any evidence that shows the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor and a licensee (such as Intel) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

16. Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

If you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between AVM and Intel, in terms of the technologies and economic circumstances of the contracting parties, when you make your reasonable royalty determination.[115]][116117]

[**Intel Proposal:**[118]   In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the alleged infringement began.  Some of the kinds of factors that you may consider in making your determination are:

---

[115]      **AVM**:   This instruction accurately reflects the law regarding comparable licenses.  Because comparable licenses are a key to the damages issues in this case, the jury should be provided an explanation as to what comparability entails.  *See Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (quoting *ResQNet.com, Inc. v. Lansa, Inc*, 594 F.3d 860, 869 (Fed. Cir. 2010))

[116]      **AVM:**   AVM's proposed jury instruction tracks AIPLA Model Instruction 11.15 and adds a brief instruction concerning the use of comparable licenses.  The last factor, which is taken verbatim from the Model Instruction, simply recognizes, consistent with the law, that the *Georgia-Pacific* factor are not exhaustive.

[117]      **Intel**: Intel objects to AVM's proposed instruction not only for the reasons explained in the footnote supporting Intel's proposal of FCBA Model Instruction 6.7, but also because AVM adds a factor to the already onerous 15-*Georgia Pacific* factors.  In addition, AVM introduces a one-sided paragraph on the use of comparable licenses.  AVM's paragraph on the use of comparable licenses is an excerpt from the 2016 AIPLA Model Instruction 11.23.  As explained in Intel's separate instruction regarding the Use of Comparable Licenses, Intel proposes that the Court give the full instruction contained in 2016 AIPLA Model Instruction 11.23, which is an accurate statement of the law that would inform the jury on an important issue in this case.  AVM's excerpt leaves out important statements of the law, and as a result, it would confuse the jury and unfairly prejudice Intel.

[118]      **Intel**: 2016 FCBA Model Instruction 6.7.  The FCBA's 2016 Model Instructions provide a new and improved analysis for evaluating reasonable royalty.  The instructions provide a reduced number of factors compared to the *Georgia-Pacific* factors, which simplifies the

(1)      The value that the claimed invention contributes to the Accused Products.

(2)      The value that factors other than the claimed invention contribute to the Accused Products.

(3)      Comparable license agreements, such as those covering the use of the claimed invention or similar technology.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.][119]

---

reasonable royalty analysis and boils it down to the key issues.  The instruction notes that the three enumerated factors are only "[s]ome of the kinds of factors" and that the jury may consider "other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people."

The Federal Circuit has explained that the *Georgia-Pacific* factors are not mandatory. *See, e.g.*, *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1230 (Fed. Cir. 2014) ("[W]e have never described the *Georgia-Pacific* factors as a talisman for royalty rate calculations."); *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) ("[T]his court does not endorse *Georgia-Pacific* as setting forth a test for royalty calculations, but only as a list of admissible factors informing a reliable economic analysis.")."

And the *Georgia-Pacific* factors have long been criticized by courts and academics alike for being too numerous without providing clear direction on how to balance the factors.  *See, e.g.*, *Apple Inc. v. Motorola, Inc.*,869 F. Supp. 2d 901, 910-911 (N.D. Ill. 2012) (questioning whether "a judge or jury" could "really balance" the "15 or more" "so-called *Georgia-Pacific* factors" and "come up with anything resembling an objective assessment"); David A. Haas, John R. Bone, & Bruce W. Burton, *An Interview of Judge Richard A. Posner on Patent Litigation* (Fall 2013), https://www.srr.com/article/interview-judge-richard-posner-patent-litigation ("Well, the Georgia-Pacific test is baloney.  Fifteen factors, that's ridiculous."); Daralyn J. Durie & Mark A. Lemley, *A Structured Approach to Calculating Reasonable Royalties*, 14 Lewis & Clark L. Rev. 627, 628-31 (2010) (criticizing the *Georgia-Pacific* factors for "overload[ing] the jury with factors … that may be irrelevant overlapping, or even contradictory").

[119]    **AVM:**  AVM objects to this proposal.  Intel's proposal relies upon the Federal Circuit Bar Association's ("FCBA") new Model Instruction 6.7, which is a significant departure from the *Georgia-Pacific* factors the Federal Circuit and district courts have relied upon to frame the

**[AVM Proposal:  6.3.  Reasonable Royalty – Timing[120]**

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon.  Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation.  Information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives, may also be considered.][121]

---

hypothetical negotiation for decades.  More importantly, both of the parties' damages experts employ the *Georgia-Pacific* framework in their damages analyses, and the FCBA instruction is subsumed within the *Georgia-Pacific* framework.  The FCBA factors do not include, for example, any consideration of the extent of the infringer's use of the patented technology, the commercial success of products using the patented technology, or alleged non-infringing alternatives—all issues discussed by the parties' experts.  Although the FCBA instruction includes a catchall for "other factors which in your mind would have increased or decreased the royalty," it is unreasonable to think that a jury will necessarily consider these types of issues without an appropriate instruction.  Accordingly, the Court should use AVM's proposed instruction 6.2, which is based on AIPLA Model Instruction 11.15 and the *Georgia-Pacific* factors.

[120]    **AVM**: AIPLA Model Instruction 11.21; *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898-900 (Fed. Cir. 1986); *Studiengesellschaft Kohle, mbH v. Dart Indus., Inc.*, 862 F.2d 1564, 1570-72 (Fed. Cir. 1988*); Fromson v. W. Litho Plate & Supply Co*., 853 F.2d 1568, 1575-76 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge v. Dana Corp.,* 383 F.3d 1337, 1342 (Fed. Cir 2004).

[121]    **Intel**: Intel objects to AVM's proposed instruction on timing.  This language is repetitive, unnecessary, confusing, and potentially prejudicial.

2016 AIPLA Model Instruction 11.21.

[**AVM Proposal:    6.4.    Reasonable Royalty – Availability of Non-Infringing Substitutes**[122]

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of non-infringing alternatives to the patented invention. A non-infringing alternative must be an acceptable product that does not infringe the patent.][123][124]

[**Intel Proposal: 6.5.    Reasonable    Royalty—Use    of    Comparable    License Agreements**[125]

---

[122]    AIPLA Model Instruction 11.20; *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1313 (Fed. Cir. 2011); *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372-73 (Fed. Cir. 2008); *Zygo v. Wyko*, 79 F.3d 1563, 1571-72 (Fed. Cir. 1996).

[123]    **AVM:** AVM's proposed instruction tracks the language of AIPLA Model Instruction 11.20.   Although the issue of non-infringing alternatives is covered by the Georgia-Pacific factors, a straightforward instruction that clearly describes the relevance of any alleged non-infringing alternatives will assist the jury.   As Intel notes, the FCBA factors do not include the availability of non-infringing alternatives.   That is yet another reason not to use the FCBA factors, given that the availability and acceptability of non-infringing alternatives has been recognized by the Federal Circuit as a significant consideration in damages

[124]    **Intel**: Intel objects to AVM's proposed instruction on the availability of non-infringing alternatives.   First, the availability of non-infringing alternatives is not one of the factors spelled out in the FCBA factors.   Therefore, its introduction would only serve to confuse the jury. Second, even if the Court were to give the Georgia-Pacific factors, the Court should not give a separate instruction on non-infringing alternatives, which would unnecessarily elevate it above the rest of the Georgia-Pacific factors, which would be confusing and potentially prejudicial.

[125]    **Intel**: 2016 AIPLA Instruction 11.23.   Intel proposes that the Court give 2016 AIPLA Model Instruction 11.23, which is an accurate statement of the law that would inform the jury on an important issue in this case.    *See also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227-28 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330-31 (Fed. Cir. 2014); *Apple Inc. v. Motorola Inc.,* 757 F.3d 1286, 1325-26 (Fed. Cir. 2014); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77-81 (Fed. Cir. 2012); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-70 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329, 1336 (Fed. Cir. 2009).

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patent[s] in question, or for rights to similar technologies.  A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between AVM and Intel in order for you to consider it.  However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between AVM and Intel, in terms of the technologies and economic circumstances of the contracting parties, when you make your reasonable royalty determination.]

[AVM Proposal:  6.6.  Doubts Resolved Against Infringer[126]

Any doubts that you may have on the issue of damages due to Intel's failure to keep proper records should be decided in favor of AVM. Any confusion or difficulties caused by Intel's records also should be held against Intel, not AVM.][127][128]

---

[126]    **AVM**: AIPLA Instruction 11.22; *see also Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572-73 (Fed. Cir. 1996); *Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1065 (Fed. Cir. 1983).  Intel claims this instruction is inappropriate because

[127]    **AVM:**  AVM's proposed instruction tracks AIPLA model Instruction 11.22, and is applicable—as Intel recognizes—only to record-keeping issues.  AVM anticipates that Intel may raise issues during trial based on the Intel records used by AVM's expert witnesses.  If it does so, the jury should properly be instructed that the limitations of Intel's records are to be construed against Intel.

[128]    **Intel**: Intel objects to AVM's proposed instruction regarding doubts being resolved against the infringer.  AVM's proposed instruction is highly prejudicial because it suggests that any doubts on the issue of damages should be resolved against Intel, even though the instruction is, on its face, meant to apply in only a very narrow and limited circumstance—when there has been a failure by the infringer to keep proper records.  Because there is no allegation that Intel failed to keep proper records or that Intel's records could cause any confusion or difficulties, the Court should reject AVM's proposal.  AVM has the burden to prove damages, and it should not be allowed to try to circumvent that burden with this unfair instruction.

## 7.  DELIBERATION AND VERDICT

## 7.1.  INTRODUCTION[129]

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence.  After you hear closing arguments of counsel, you will return to the jury room to begin your deliberations.  Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, to me, or to anyone else except each other about the case.  The first thing you should do is select a foreperson. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you. Any questions or messages normally should be sent to me through your foreperson.

## 7.2.  UNANIMOUS VERDICT[130]

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not

---

[129]     1993 Model Instructions; *AVM1*

[130]     *AVM1*; 1993 Model Instructions.

surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A verdict form has been prepared for you. The verdict form asks you a series of questions about the parties' claims. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form. You will then return to the courtroom and your foreperson will give your verdict. Unless you are directed otherwise in the verdict form, you must answer all of the questions posed, and you all must agree on each answer.

It is proper to add the caution that nothing said in these instructions and nothing in the verdict form is meant to suggest or convey in any way or manner what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

### 7.3.  DUTY TO DELIBERATE[131]

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach a unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and your original position was wrong.

---

[131]    *AVM1*; 1993 Model Instructions.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that – your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

### 7.4.    COURT HAS NO OPINION[132]

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

Finally, if I have read any of these instructions inconsistently with the written text, you are to rely on the written instructions in your deliberations.

---

[132]    *AVM1*; 1993 Model Instructions.

Respectfully submitted,

ROSS ARONSTAM & MORITZ LLP

POTTER ANDERSON & CORROON LLP

*/s/ Benjamin J. Schladweiler*
Benjamin J. Schladweiler (#4601)
Nicholas D. Mozal (#5838)
100 S. West Street, Suite 400
Wilmington, DE 19801
(302) 576-1600
bschladweiler@ramllp.com
nmozal@ramllp.com

*Of Counsel*:

D. Michael Underhill
Eric J. Maurer
Patrick M. Lafferty
Jon R. Knight
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
munderhill@bsfllp.com
emaurer@bsfllp.com
plafferty@bsfllp.com
jknight@bsfllp.com

Edward H. Takashima
BOIES SCHILLER FLEXNER LLP
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
etakashima@bsfllp.com

Rosanne C. Baxter
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
rbaxter@bsfllp.com

Jason G. Sheasby
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
(310) 203-7096
jsheasby@irell.com

*Counsel for Plaintiff AVM Technologies, LLC*

*/s/ Bindu A. Palapura*
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Of Counsel*:

William F. Lee
Lauren B. Fletcher
Jordan L. Hirsch
Kevin A. Goldman
Sarah R. Frazier
WILMERHALE
60 State Street
Boston, MA 02109
william.lee@wilmerhale.com
lauren.fletcher@wilmerhale.com
jordan.hirsch@wilmerhale.com
kevin.goldman@wilmerhale.com
sarah.frazier@wilmerhale.com

David C. Marcus
WILMERHALE
350 South Grand Avenue
Suite 2100
Los Angeles, CA 90071
david.marcus@wilmerhale.com

William G. McElwain
Todd Zubler
Brittany Amadi
WILMERHALE
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
william.mcelwain@wilmerhale.com
todd.zubler@wilmerhale.com
brittany.amadi@wilmerhale.com

Matthew Leary
WILMERHALE
1225 Seventeenth Street
Suite 2600
Denver, CO 80202
matthew.leary@wilmerhale.com

*Counsel for Defendant Intel Corporation*

Dated:  April 14, 2017