# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AVM TECHNOLOGIES, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| INTEL CORPORATION, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

C.A. No. 15-33-RGA-MPT

**REDACTED PUBLIC VERSION**

## PLAINTIFF AVM'S MEMORANDUM IN SUPPORT OF ITS RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW ON INFRINGEMENT, VALIDITY, AND ENFORCEABILITY

*Of Counsel*:

D. Michael Underhill
Eric J. Maurer
Patrick M. Lafferty
Jon R. Knight
Joseph Alm
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
munderhill@bsfllp.com
emaurer@bsfllp.com
plafferty@bsfllp.com
jknight@bsfllp.com
jalm@bsfllp.com

Edward H. Takashima
BOIES SCHILLER FLEXNER LLP
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
etakashima@bsfllp.com

Rosanne C. Baxter
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
rbaxter@bsfllp.com

Benjamin J. Schladweiler (#4601)
Nicholas D. Mozal (#5838)
ROSS ARONSTAM & MORITZ LLP
100 S. West Street, Suite 400
Wilmington, DE 19801
(302) 576-1600
bschladweiler@ramllp.com
nmozal@ramllp.com

*Counsel for Plaintiff AVM Technologies, LLC*

Jason G. Sheasby
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
(310) 203-7096
jsheasby@irell.com

Dated:  May 8, 2017

## TABLE OF CONTENTS

I.      Infringement.............................................................................................................. 1

        A.      The Evidence Establishes that Intel Made or Sold in, or Imported into, the
                United States More than 562 Million Chips. .......................................................... 1

        B.      The Evidence Establishes that All Accused Products Meet All Limitations
                of Claim 1 and its Dependent Claims .................................................................... 2

        C.      The Evidence Established that All Accused Products Meet All Limitations
                of Claim 21. ....................................................................................................... 6

II.     Reverse Doctrine of Equivalents ........................................................................... 7

III.    Validity ............................................................................................................... 9

        A.      Anticipation................................................................................................... 9

        B.      Obviousness ................................................................................................. 15

IV.     Enforceability...................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*DePuy Spine, Inc. v. Medtronic Sofamore Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ............................................................................ 7

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
  339 U.S. 605 (1950) ............................................................................................... 8

*Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*,
  62 F.3d 1512 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997) ............ 8

*Intellectual Ventures LLC v. Motorola Mobility, LLC*,
  72 F. Supp. 3d 496 (D. Del. 2014) ......................................................................... 1

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ............................................................................................... 1

*Sanofi-Synthelabo v. Apotex, Inc.*,
  550 F.3d 1075 (Fed. Cir. 2008) .............................................................................. 9

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985) (en banc) ............................................................. 8

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997) ................................................................................................. 8

**Statutes**

35 U.S.C. § 103 ........................................................................................................... 15

35 U.S.C. § 271 ............................................................................................................. 1

**Rules**

Fed. R. Civ. P. 50 ......................................................................................................... 1

AVM respectfully moves pursuant to Fed. R. Civ. Pro. 50(a) for a judgment as a matter of law ("JMOL") on its claims of infringement of the '547 patent and on the defenses raised by Intel.  Pursuant to Rule 50(a), the Court may grant JMOL where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  In considering a motion for JMOL, "the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make any credibility determinations or weigh the evidence."  *Id.*  (citations omitted).  "The Court must determine not whether there is literally no evidence supporting the non-moving party, but whether there is evidence upon which the jury could properly find for the non-moving party."  *Intellectual Ventures LLC v. Motorola Mobility, LLC*, 72 F. Supp. 3d 496, 502 (D. Del. 2014).

## I.  Infringement

The evidence requires a reasonable jury to find, by a preponderance of the evidence, that Intel's Accused Products—the Sandy Bridge, Ivy Bridge, Haswell, and Broadwell families of microprocessors—infringe claims 1, 2, 4-7, 9, and 21 of the '547 patent under 35 U.S.C. § 271(a).

### A.  The Evidence Establishes that Intel Made or Sold in, or Imported into, the United States More than 562 Million Chips.

The parties stipulated that 562,835,878 accused Intel microprocessors in the Sandy Bridge, Ivy Bridge, Haswell, and Broadwell families were "made in, sold in, or imported to the United States before expiration of the '547 patent."  (D.I. 713, Tr. at 1514-1515; *see also* D.I. 676 ¶ 18.)

### B. The Evidence Establishes that All Accused Products Meet All Limitations of Claim 1 and its Dependent Claims

The record evidence requires a reasonable jury to conclude that all Accused Products infringe claim 1 and its dependent claims 2, 4-7, and 9.  AVM's infringement expert, Dr. Marwan Hassoun, testified that ███████████ across all single-core versions of the four product families meet every claim limitation of independent claim 1, as well as all additional claim elements added by dependent claims 2, 4-7, and 9. (D.I. 710, Tr. at 547, 560-566; *see also id*. at 533- 538, 539-541 (discussing the ███████████ in the Haswell chip as representative of all infringing circuits in all products of all four families and explaining in detail why "it's a ███████████ of the '547 patent.").

Among other things, Dr. Hassoun explained in detail why every accused circuit met the last claim element of claim 1: that there be "a delay coupled to the precharge transistor for simultaneously activating the precharge and evaluation transistors."  (*Id.* at 547-559.)  Dr. Hassoun testified that the delay circuit elements he identified "delay the signal to the precharge transistor," and thereby "cause[] simultaneous activation of the precharge and evaluation transistors at end of the precharge phase":

> If you remember the picture in the patent had a delay for causing simultaneous activation. *That's the delay for causing simultaneous activation right there*. And it's made up of these four -- five, these five different elements. Q. Okay. A. So when the clock travels through them, *it's going to get delayed a bit*, delayed a bit, so collectively they are the delay.  (*Id.* at 537 (emphasis added).)

> *What causes a simultaneous activation is the relative delay between these two paths.* So the key to simultaneous activation is that you turn the precharge transistor on before you turn the -- you turn the evaluation transistor on before you turn the precharge transistor off. *So you need delay on the top more than the delay on the bottom.  So the delay on the top is for causing the simultaneous activation*.  (*Id.* at 541.)

Dr. Hassoun also testified that Intel's ███████████ showed that the accused circuits have simultaneous activation.  (*Id.* at 554-559.)  In this regard, Intel

previously advised the Court that the ▮▮▮▮▮▮▮▮▮▮▮▮ was sufficient to determine

infringement.  (Intel's March 13, 2017 Kessler Reply, D.I. 532 at 6 n.8 ("▮▮▮▮ provides the

only ▮▮▮▮ information needed to analyze infringement.").)  Dr. Hassoun explained how he used

Intel's own ▮▮▮▮ and source code to calculate the extent of simultaneous activation for every

single one of the accused circuits, (D.I. 710, Tr. at 548) and that Intel generates contention

reports throughout the design process that tell the design engineers how much contention is in

each accused circuit (*id.* at 548-549.) Dr. Hassoun performed extensive modeling to determine

the magnitude and scope of simultaneous activation.  (*id.* at 585-588.)  It is undisputed that

simultaneous activation in the accused circuits can exceed 100 picoseconds, (*id.* at 553); and that

there are ▮▮▮▮▮▮▮▮▮▮ in the single core chips in the Sandy Bridge family, (*id.* at 554);

▮▮▮▮▮▮▮▮▮▮▮▮ in the single core chips in the Ivy Bridge family, (*id.* at 555-556);

▮▮▮▮▮▮▮▮▮▮▮ in the single core chips in the Haswell family, (*id.* 552); and ▮▮▮

▮▮▮▮▮▮▮▮ in the single core chips in the Broadwell family, (*id.* 558-559).

Dr. Hassoun also testified that, during the design process, Intel continually "dials in" the

amount of contention by changing delay elements.  (D.I. 713, Tr. at 1738-1739.)  He explained,

for example, that the delay elements of the same circuit in a later generation of products may be

adjusted to change the amount of simultaneous activation, demonstrating that "the delay is for

the purpose of simultaneous activation."  (*Id.* at 1746-1749.)  He also discussed another example

of Intel "dialing" in the amount of contention in two circuits in the Ivy Bridge family of products

that had many of the same components, but with different delay elements that resulted in

different amounts of simultaneous activation.  (*Id.* at 1748-1750.)

Finally, although AVM believes that it need not show that Intel *intended* to use the delays

in the Accused Products to cause the simultaneous activation in the infringing circuits, the

evidence is overwhelming that Intel's engineers intentionally used a delay to create simultaneous activation when needed in its critical register file circuits.  (D.I. 711, Tr. at 774-776.)  Intel has increased the amount of allowed contention in each successive generation of the Accused Products, from ████████████████████ (D.I. 710, Tr. at 583-584; PTXs 222, 229, 1155, 1156.)  Further, Dr. Hassoun testified that:

- Intel knows its circuits have simultaneous activation but have not eliminated it, even though its engineers testified they could do so with "no problem."  (D.I. 710, Tr. at 571.)

- The delay and resulting simultaneous activation is in the accused circuits for an express purpose: to increase the performance and reliability of the circuits.  (*Id.* at 513.)

- Each circuit is designed individually, and the "engineers have to make a decision as to what they need to do in order to get the fastest circuit, the most power efficient circuit, and the most reliable circuit."  (*Id.* at 513-514.)

- Because simultaneous activation has a higher power drain, engineers would only put it into a circuit where it is needed for the other benefits, including speed and reliability.  (*Id.* at 514; D.I. 711, Tr. at 775.)

- The use of the simultaneous activation is limited to a subset of the register file circuits, evidencing that Intel weighed the costs and benefits of using simultaneous activation on a circuit-by-circuit basis.  (D.I. 710, Tr. at 542.)

Intel does not contest that the Accused Products practice all claim elements of claim 1 and its dependent claims, with the exception of the last claim element of claim 1: that there be a delay coupled to the precharge transistor *for* simultaneously activating the precharge and evaluation transistors.  (D.I. 713, Tr. at 1460, 1466.)  Even then, Dr. Subramanian's only dispute with Dr. Hassoun comes down to a single word: "for." Intel's expert Dr. Subramanian concedes that every accused product has a ████████████████████ and that the ████████ ████████████████ are on at the same time.  (*Id.* at 1466-1467.)  He also admits that Intel is well aware that it has produced chips with more than ████████████ with simultaneous activation:

4

> Q.  Okay.  And Intel knows that throughout the whole design
> phase, they know that they are producing ▮▮▮▮▮▮▮▮▮▮▮
> that have simultaneous activation; is that correct?
> A.  Almost certainly not over the entire design phase, but at least
> for part of the design phase.
> Q.  Okay.  Certainly by the end of the design phase they know
> exactly how many circuits they have that have simultaneous
> activation, correct?
> A.  Sure.
> Q.  And then they proceed to manufacture those chips and sell
> them to the market, correct?
> A.  Yes, that's true.

(*Id.* at 1457-1458.)

Dr. Subramanian's non-infringement position appears to be that removal of the delay in

Intel's products allegedly would increase simultaneous activation elsewhere in the circuit, (*id.* at

1448-1449), and that the Court's "for causing" language means that "the function of the delay

has to be—in other words, the delay structure has to be there to cause that to happen."  (*Id.* at

1444.)

Even assuming for the sake of argument that Dr. Subramanian is factually correct about

the results of removal, Dr. Hassoun explained that it is nevertheless the delay circuit elements in

each of the infringing circuits that creates the relative delay and thereby causes simultaneous

activation:

> Q. Okay.  Now, Intel's argument in this case, I believe as articulated by Mr. Lee,
> is that the delay that is referred to in Claim 1 is not for causing simultaneous
> activation. Could you please address that argument? . . . . A. So if you look at this,
> you have the delay. I showed you the -- sorry. So the delay is in the purple box, in
> the purple oval over there. That's the delay that's inserted in there and *that's the
> delay that causes simultaneous activation in the claim, because what it does, it
> sets the relevant delay between the evaluation and the precharge path and as such
> you get, you get the contention.* So it's there. It's allowed to be there. Contention
> policy allows it to be there, so it's -- it's there on purpose.  (D.I. 710, Tr. at 569-
> 570 (emphasis added).)

Intel argues that a relative delay in timing that causes simultaneous activation is different

from a delay element causing simultaneous activation.  (D.I. 700 at 3.)  But as discussed above,

Dr. Hassoun testified that any relative delay between two paths is created by at least one delay element ████████████████ which necessarily is *for causing* the simultaneous activation. (D.I. 710, Tr. at 541; 570.)

### C. The Evidence Established that All Accused Products Meet All Limitations of Claim 21.

The record evidence also requires a reasonable jury to conclude that all Accused Products infringe claim 21.  Dr. Hassoun testified that the accused Intel circuits infringe method claim 21. As with claim 1, Intel disputed only the last claim element: "delaying the precharge clock phase to the precharge transistor so that the precharge transistor is activated during a minor portion of the evaluation clock phase."  (*Id.* at 566-567.)  And even with respect to that claim element, Intel and Dr. Subramanian conceded that all of the Accused Products "delay the ████████ ██████████████████████" (D.I. 713, Tr. at 1463-1464), and that "the ████████████ is activated during a minor portion of the ██████████████████" (*Id.* at 1464.)  Thus, the only remaining dispute is around the words "so that."  Intel's arguments fail for the same reasons stated above with respect to the "for causing" language in claim 1.

The evidence is also compelling that Intel has performed the step of delaying the ███████████████████████████████ for all accused products in the United States, as required by claim 12.  Dr. Hassoun testified that Intel tests the Accused Products in the United States to make sure that they work.  (D.I. 710, Tr. at 567 ("these chips are at least three of the families are tested and assembled and tested in the United States."); *id.* at 569 ("after the chips are manufactured you have to test them to make sure they work before you -- before you ship them to your customers. Otherwise, you know, you have to throw away some of the chips that don't work. You can't ship defective chips to your customer, so testing the chip happens at Intel

facilities and it happens there in the United States).)  Further, Dr. Hassoun testified that Intel

tests 100 percent of its chips.  (*Id.* ("A hundred percent, every single chip needs to be tested.").)

## II. Reverse Doctrine of Equivalents

Because AVM established literal infringement, the burden shifted to Intel to set forth a

prima facie case of non-infringement under the reverse doctrine of equivalents ("RDOE").[1]  Intel

failed to do this, and even if it had established a prima facie case, no reasonable jury could find

non-infringement under the doctrine.  Intel expert Dr. Subramanian's reverse doctrine of

equivalents testimony is that the principle "behind the '547 patent is to have a delay to cause

overlap" and that "[t]he Intel circuits use delay to minimize or eliminate overlap."  (D.I. 712, Tr.

at 1451-1452.)  This defense fails as a matter of law for at least three reasons.

First, Intel's RDOE argument is identical to its literal infringement defense, even though

RDOE only comes into play if Intel literally infringes the asserted claims.  *DePuy Spine, Inc. v.

Medtronic Sofamore Danek, Inc.*, 567 F.3d 1314, 1338 (Fed. Cir. 2009).  Claim 1 recites a "delay

coupled to the precharge transistor for simultaneously activating the precharge and evaluation

transistors."  (PTX1 at 8:52-54.)  The Court construed "for simultaneously activating" to mean,

"for causing to be on at the same time."  (D.I. 682 at 2.)  For purposes of the reverse doctrine of

equivalents, it must be assumed that Intel included a delay "for causing" the transistors to be on

at the same time.

Second, if Intel is suggesting that it meets the "for causing" limitation but still does not

---

[1] AVM maintains its objection to having the jury decide this defense.  The reverse doctrine of equivalents is an "equitable doctrine" for a judge, not jury.  *Ciena Corp. v. Corvis Corp.*, No. 00-662-JJF, 2004 WL 253481, at *2 (D. Del. Feb. 6, 2004) (reverse doctrine of equivalents is grounded in equity and does not require trial to a jury); *see also Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1581 (Fed. Cir. 1991) (it "is an equitable doctrine").  The jury instruction on the issue adds unnecessary complexity—with a significant risk of confusion—to the case.  If the jury is to decide the issue, the jury should be provided with the instruction that AVM proposed.

infringe under the RDOE because it did not *intend* its delay elements to be the cause of the activation, then its argument fails as a matter of law, because intent is not relevant to infringement. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 36-37 & 41 (1997) (infringement, including related to equivalence, judged objectively); *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1523 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997) ("[a]ccidental or 'innocent' infringement is still infringement."); *cf. Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950) (the RDOE is an application of the doctrine of equivalents in against the patentee).

Third, Dr. Subramanian's testimony does not explain how the Intel products perform "the same or similar function in a substantially different way." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1124 (Fed. Cir. 1985) (en banc). If it is assumed that Intel literally infringes the simultaneous activation limitations—as is the case under the RDOE—Intel must establish how the simultaneous activation is achieved differently than in the patent. It is undisputed, however, that Intel's circuits have delay circuits and have simultaneous activation. Intel has not even attempted to explain how that simultaneous activation is achieved—let alone how it is achieved in a way that is different than in the patent. (D.I. 712, Tr. at 1451-1452.)

Finally, even if Intel had made a prima facie showing under the RDOE, the evidence overwhelmingly establishes: that Intel's products have delay elements; that those delay elements delay the signal to the precharge transistor; and that as a result, there is simultaneous activation. (*See, e.g.*, D.I. 713, Tr. at 1730-73; D.I. 710, Tr. at 537-559.) This is precisely the same way that simultaneous activation is achieved in the '547 patent. And as described above, the evidence also establishes that Intel knows (and intends) that the delays cause simultaneous activation. The delay elements used by Intel operate using the same principles as in the patent.

8

### III. Validity

In the pretrial order, Intel stated that it would present anticipation, obviousness, written description, definiteness, and utility defenses.  (D.I. 676, Ex. 3.)  Intel dropped all but the anticipation and obviousness defenses, relying on the Myers & Ivey article (DTX75) as an anticipatory reference for claims 1, 2, 6, 7, 9, and 21, and Myers & Ivey in light of Wang (DTX79) for obviousness with respect to claims 4, 5, 6, 7, and 21.  (D.I. 713, Tr. at 1793.)  No reasonable jury could find clear and convincing evidence of invalidity.

As will be described below, Intel's evidence on Myers & Ivey suffers from several flaws including a misidentification of the transistor used to perform a hold function as an evaluation transistor.  This is a flaw for all asserted claims.

But *critically*, even if Intel is correct, and the hold transistor is an evaluation transistor, then Intel still has not provided evidence that claims 6-7 and 21 are invalid in light of Myers & Ivey.  One reason is that the hold transistor (which Intel misidentifies as an evaluation transistor) remains on for the entire precharge and discharge (evaluation) phases in Myers & Ivey.  As a result, it does not switch "between an *inactive state* during the precharge clock phase and an active state during the evaluation clock phase" as required by claim 6.  It also does not meet the nearly identical limitation in claim 21.  Intel's expert failed to explain how either Myers & Ivey or Wang necessarily includes these limitations in claims 6 and 21—or why it would have been obvious to alter these references to achieve the claimed functionality.

### A.  Anticipation

Intel bears the burden of proving by clear and convincing evidence that "every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008).  Intel does not contend

that Myers & Ivey anticipates claims 4 and 5—it does not disclose the recited "anti-float circuit" limitation.  (D.I. 713, Tr. at 1597, 1793.)  Intel failed to provide evidence establishing that Myers & Ivey and Wang have several other claim limitations, including:

> Claim 1 (and all dependent claims)—"an evaluation transistor between the dynamic logic block and the precharge transistor" and "a delay coupled to the precharge transistor for simultaneously activating the precharge and evaluation transistors."
>
> Dependent claims 6 and 7—"a clock signal node coupled to the gates of the precharge and evaluation transistors for receiving a clock signal having precharge and evaluation phases for switching the precharge transistor between an active state during the precharge phase and an inactive state during a major portion of the evaluation phase and for switching the evaluation transistor between an inactive state during the precharge clock phase and an active state during the evaluation clock phase."
>
> Claim 21—"switching an evaluation transistor between an inactive state during the precharge clock phase and an active state during the evaluation clock phase" and "delaying the precharge clock phase to the precharge transistor so that the precharge transistor is activated during a minor portion of the evaluation clock phase."

(*See, e.g.*, Tr. 1644-1725.)

Intel's invalidity expert, Dr. Ivey, admitted that if the hold transistor in Meyers & Ivey (the middle transistor in purple, below) is not an evaluation transistor, the article does not anticipate the '547 patent.  (D.I. 713, Tr. at 1635-1636.)  The Court construed "evaluation transistor" to mean, "a transistor that is connected to a clock signal and is used to control when the precharge node may discharge."  (D.I. 682 at 2.)[2]  Dr. Ivey did not apply this construction or even attempt to explain how the middle transistor in purple below meets the Court's construction.

---

[2] As described at trial, the Wang article (DTX79) describes this transistor as a hold transistor, and the bottom transistor as an evaluation transistor.  (Tr. at 1638, 1672-1675.)

Taken from PDX919[3]

There is no dispute that this middle transistor remains on for the entirety of the precharge and discharge (evaluation) stages.  (D.I. 713, Tr. at 1671; *also* DTX75 at Fig. 3(b) (comparing $\theta_1$ and $\theta_2$).)[4]  As a result, it is not "***used*** to control ***when*** the precharge node may discharge." (*Id.* at 1665-1677.)  Instead, there is no dispute that another transistor—the bottom transistor colored in green above—is used to control ***when*** the precharge node discharges.  The bottom transistor is the evaluation transistor because it initiates discharge by turning on.  (*Id.* at 1666-1670.)  Myers & Ivey says as much: "When $\theta_1$ goes high [and hence activates the bottom transistor,] node X conditionally discharges depending on the logic values on the inputs."  (DTX75 at 3.)

Dr. Ivey did not explain how the hold (middle) transistor, which is on for the entirety of the precharge and evaluation phases, is ***used*** to control ***when*** the discharge occurs.  He provided

---

[3] Attached as Exhibit A to this motion are demonstratives used during the testimony of AVM's validity expert, Dr. Wolfe.

[4] Signal $\theta_2$, which is the signal input to the hold transistor, isolates node X, permitting it to store a previously evaluated logic level.  (DTX75 at 3 ("When $\theta_2$ goes low node X is isolated, storing its previously evaluated logic level.").)

a single theory:  if the circuitry were redesigned so that the transistor was off, instead of on, during both of these phases, then the precharge node could not discharge.  (D.I. 713, Tr. at 1584.) This is irrelevant.  A myriad of circuits are preconditions for the precharge node to discharge— including a transistor controlling power to the clock signal, for example, or transistors several circuits prior to the current circuit.  (*Id.* at 1668-1669.)  But the Court's construction requires that the transistor must actually be ***used*** to control ***when*** (*i.e.*, the time that) the discharge occurs. That is not how the hold (middle, purple) transistor is used.  It is on for the entirety of both the precharge and evaluation/discharge phases so (as configured) it is incapable of initiating the discharge.  (*Id.* at 1671.)

The text of Meyers & Ivey confirms that the hold transistor is not an evaluation transistor. The article identifies the lower transistor—which no one argues anticipates the claims—as being in the evaluation network, not the hold transistor.  (*Id.* at 1639; 1667; 1672; DTX75 at 1, 3 (while precharging, the evaluating transistor network is disabled: "For each gate the output node is initially precharged to logic 1 whilst the transistor network which evaluates the logic function of the gate is disabled. . . . When precharging is complete the logic network is enabled conditionally discharging the output node to evaluate the logic value."); *see also* D.I. 713, Tr. at 1662 (precharge and evaluation phases are mutually exclusive).)

As Dr. Ivey concedes, if the hold transistor (purple) is not an evaluation transistor, then Myers & Ivey does not anticipate the claims.  (D.I. 713, Tr. at 1635-1636.)  The reason is because, although the bottom transistor (in green) could be considered an evaluation transistor, it is not "between the dynamic logic block and precharge transistor," as required by claim 1. (PTX1; D.I. 713, Tr. at 1676.)  And that bottom transistor and the precharge transistor are not simultaneously activated, per claims 1 and 21 (the precharge and evaluation phases are mutually

exclusive).  (PTX1; D.I. 713, Tr. at 1676-77; *see also* Tr. at 1631, 1662, 1724-25.)

Even if the middle transistor is (incorrectly) considered to be an evaluation transistor, Intel did not show that either Myers & Ivey or Wang included the following limitation from claim 6:

> a clock signal node coupled to the gates of the precharge and evaluation transistors for receiving a clock signal having precharge and evaluation phases for switching the precharge transistor between an active state during the precharge phase and an inactive state during a major portion of the evaluation phase and for switching the evaluation transistor between an inactive state during the precharge clock phase and an active state during the evaluation clock phase.

Similarly, even if the middle transistor is (incorrectly) considered to be an evaluation transistor, Intel did not show that either Myers & Ivey or Wang included the following limitations from claim 21:

> switching an evaluation transistor between an inactive state during the precharge clock phase and an active state during the evaluation clock phase;
>
> delaying the precharge clock phase to the precharge transistor so that the precharge transistor is activated during a minor portion of the evaluation clock phase.

Dr. Ivey's trial testimony provides no explanation of how his article or the Wang article disclose any of these limitations:  he merely summarily states they are disclosed, regurgitates the Court's claim construction, and mentions "clock skew."  (D.I. 713, Tr. at 1603-1610.)  This summary treatment of these limitations is no accident.  Both parties' experts agree that Myers & Ivey (and Wang) disclose mutually exclusive precharge and discharge phases.  (*Id.* at 1631, 1662, 1724-25.)  And the transistor that Dr. Ivey incorrectly identifies as the evaluation transistor—the hold transistor controlled by signal $\theta_2$—is disclosed as being on for the entire precharge and evaluation periods. (*Id.* at 1671; *also* DTX75 at Fig. 3(b) (comparing $\theta_1$ and $\theta_2$).).

The figure below illustrates the precharge (Tp) and discharge (Td) phases.  (D.I. 713, Tr. at 1631, 1662, 1724-25.)





**Illustrates Dr. Ivey's Slide DDX6.46, with an "X" drawn through the "Evaluation Transistor" Label**

**Fig. 3(b) of Myers & Ivey, Correctly Color Coded to Show Signal $\theta_1$ Controlling the Precharge and Evaluation Transistors**

If the middle transistor (which is controlled by signal $\theta_2$) is an evaluation transistor, then Dr. Ivey has not identified the "node" that both it and the top transistor are required to be connected to (i.e., he hasn't established where Myers & Ivey and Wang disclose "a clock signal node coupled to the gates of the precharge and evaluation transistors," PTX1 claim 6.)[5] He also did not explain how, in light of the mutually exclusive precharge (Tp) and evaluation (Td) phases, there can possibly be a disclosure of, "for receiving a clock signal having precharge and evaluation phases for switching the precharge transistor between an active state during the precharge phase and an inactive state during a major portion of the evaluation phase and for switching the evaluation transistor between an inactive state during the precharge clock phase and an active state during the evaluation clock phase."  There is not.  The only clock signal in Myers & Ivey and Wang that could possibly perform this function is signal $\theta_1$; but that signal is

---

[5] The "evaluation transistor" in claim 6 refers to the same "evaluation transistor" recited in claim 1.

not sent to the transistor that Dr. Ivey identifies as the "evaluation transistor" (i.e., the middle transistor that receives signal $\theta_2$). And as described above, the transistor that Dr. Ivey identifies as the "evaluation transistor" remains active/on for the entire precharge phase—it is not inactive during the precharge phase, or switched during the relevant periods, as required by the claim. (D.I. 713, Tr. at 1671; *also* DTX75 at Fig. 3(b) (comparing $\theta_1$ and $\theta_2$).)[6]

For these same reasons, Dr. Ivey's hold transistor (which he identifies as the evaluation transistor) does not switch between "an inactive state during the precharge clock phase and an active state during the evaluation clock phase," as required by claim 21. (PTX1.) And even if Dr. Ivey is correct (he is not) that hold transistor is an evaluation transistor, he provides no explanation of how the precharge transistor is "activated during a minor portion of the evaluation clock phase." (PTX1, claim 21.) As illustrated in the figure above, the precharge phase (Tp) and evaluation phase (Td) are mutually exclusive. (D.I. 713, Tr. at 1631, 1662, 1724-25.)

## B. Obviousness

Intel has failed to show that the '547 patent is invalid as obvious under 35 U.S.C. § 103. For Intel to have succeeded in this defense, it would have had to show, by clear and convincing evidence, that the '547 patent would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of technology of the patent.

As an initial matter, Intel claims that it has presented an obviousness case for claims 4, 5, 6, 7, and 21. (D.I. 713, Tr. at 1793.) But the only claims that its expert provided an obviousness analysis for are claims 4 and 5. (*Id.* at 1600-1601.) For those claims, Dr. Ivey combined Wang's

---

[6] Intel did not argue that the the evaluation and precharge phases are based on the clock phi-2. If they had, then the precharge transistor would not switch between an active state during the precharge phase and an inactive state during a major portion of an evaluation phase, as required in claims 6 and 21.

disclosure of an "anti-float circuit" with the circuitry disclosed in Myers & Ivey.  (*Id.*)[7]  But he

did not explain why one of ordinary skill in the art would have been motivated to make that

combination—or how exactly the resultant circuit would look after the combination.  (*Id.*)

Dr. Ivey did not present an obviousness analysis for claims 6, 7, and 21.  (*Id.* at 1603-

1610.)  Dr. Ivey failed to (1) explain any differences between these pieces of prior art and the

claimed invention; (2) provide any reason or motivation to combine the relevant references or

prior art components; (3) discuss whether his proposed combinations would produce a

reasonable expectation of success; or (4) discuss the other relevant considerations for

obviousness.  Among the other relevant considerations are:

> (1) whether the claimed invention was a predictable result of using
> prior art elements according to their known functions; (2) whether
> the claimed invention provides an obvious solution to a known
> problem in the relevant field; (3) whether the prior art teaches or
> suggests the desirability of combining elements claimed in the
> invention; (4) whether the prior art teaches away from combining
> elements in the claimed invention; (5) whether it would have been
> obvious to try the combinations of elements, such as when there is
> a design need or market pressure to solve a problem and there are a
> finite number of identified, predictable solutions; and (6) whether
> the change resulted more from design incentives or other market
> forces.

(See Final Jury Instructions at 22-23.)

Dr. Ivey does mention that the Wang article discusses the Meyers & Ivey article and

added an anti-float circuit.  (D.I. 713, Tr. at 1599-1601.)  But claims 6, 7, and 21 do not recite an

anti-float circuit. As discussed above, Myers & Ivey and Wang are missing a number of claim

limitations; Dr. Ivey does not explain why it would have been obvious to alter the prior art to

obtain a claimed combination with the missing limitations.  It would not have been.  (*See, e.g.,*

---

[7] Professor Ivey also identified two additional references for the state of the prior art, Rajivan
and the Pentium Pro.  But Intel does not rely upon these references in its obviousness
combinations.  Indeed, Dr. Ivey did not attempt to combine these references or explain how they
could possibly be combined with Myers & Ivey or Wang.

*Id.* at 1644-1725.)

## IV. Enforceability

In the pretrial order, Intel identified three equitable defenses in addition to the reverse doctrine of equivalents:  equitable estoppel; waiver, and unclean hands.  (D.I. 676, Ex. 5 at 24-26.)  Intel's position is that, even though the reverse doctrine of equivalents is an equitable defense, it should be tried to the jury because it involves factual issues.  Intel presented some evidence related to its equitable reverse doctrine of equivalents defense, but none for these other three defenses.  (*See* D.I. 676, Ex. 4 at 32-34 and Ex. 5 at 24-26 for the parties' competing summaries of the underlying law governing these defenses.)

* * * *

For at least these reasons, AVM respectfully requests that the Court grant it a Judgment as a Matter of Law of infringement, validity, and enforceability.

17

Respectfully submitted,

ROSS ARONSTAM & MORITZ LLP

*Of Counsel*:

D. Michael Underhill
Eric J. Maurer
Patrick M. Lafferty
Jon R. Knight
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727
munderhill@bsfllp.com
emaurer@bsfllp.com
plafferty@bsfllp.com
jknight@bsfllp.com

Edward H. Takashima
BOIES SCHILLER FLEXNER LLP
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
(310) 752-2400
etakashima@bsfllp.com

Rosanne C. Baxter
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200
rbaxter@bsfllp.com

Dated:  May 8, 2017

*/s/ Benjamin J. Schladweiler*
Benjamin J. Schladweiler (#4601)
Nicholas D. Mozal (#5838)
100 S. West Street, Suite 400
Wilmington, DE 19801
(302) 576-1600
bschladweiler@ramllp.com
nmozal@ramllp.com

*Counsel for Plaintiff AVM Technologies, LLC*

Jason G. Sheasby
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
(310) 203-7096
jsheasby@irell.com

18

## CERTIFICATE OF SERVICE

I, Benjamin J. Schladweiler, hereby certify that on May 8, 2017, a true copy of the foregoing *Plaintiff AVM's Memorandum in Support of its Rule 50(a) Motion for Judgment as a Matter of Law on Infringement, Validity, and Enforceability* was served via electronic mail upon the following counsel of record:

David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
dmoore@potteranderson.com
bpalapura@potteranderson.com

David J. Burman
Jonathan L. McFarland
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
dburman@perkinscoie.com
jmcfarland@perkinscoie.com

Jason Kipnis
WILMERHALE
950 Page Mill Road
Palo Alto, CA 94304
jason.kipnis@wilmerhale.com

Todd Zubler
William G. McElwain
Brittany Amadi
WILMERHALE
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
todd.zubler@wilmerhale.com
william.mcelwain@wilmerhale.com
brittany.amadi@wilmerhale.com

*Counsel for Defendant Intel Corporation*

William F. Lee
Jordan L. Hirsch
Lauren B. Fletcher
Kevin A. Goldman
Claire M. Specht
Sarah R. Frazier
Michaela P. Sewall
Steven J. Horn
Joseph J. Mueller
WILMERHALE
60 State Street
Boston, MA 02109
william.lee@wilmerhale.com
jordan.hirsch@wilmerhale.com
lauren.fletcher@wilmerhale.com
kevin.goldman@wilmerhale.com
claire.specht@wilmerhale.com
sarah.frazier@wilmerhale.com
michaela.sewall@wilmerhale.com
steven.horn@wilmerhale.com
joseph.mueller@wilmerhale.com

David C. Marcus
WILMERHALE
350 South Grand Avenue
Suite 2100
Los Angeles, CA 90071
david.marcus@wilmerhale.com

Matthew Leary
WILMERHALE
1225 Seventeenth Street
Suite 2600
Denver, CO 80202
matthew.leary@wilmerhale.com

*Counsel for Defendant Intel Corporation*

 */s/ Benjamin J. Schladweiler*
Benjamin J. Schladweiler (#4601)